Orville B. McCOY and Model Dairy Products Company, Appellants, ·

v.

Nancy CARTER, Adm'x. of Estate of Charles William Carter, Deceased, and Bituminous Casualty Corporation, Appellees.

Court of Appeals of Kentucky.

March 6, 1959.

Woodward, Bartlett & McCarroll, Clarence Bartlett, Owensboro, for appellants.

Ridley M. Sandidge, Byron, Sandidge, Holbrook & Craig, Owensboro, for Nancy Carter, Admx. of Estate of Charles William Carter, Dec'd.

James M. Graves, John G. Hicks, Boehl, Stopher, Graves & Deindoerfer, Louisville, for Bituminous Cas. Corp.

STEWART, Judge.

Plaintiff, Nancy Carter, as administratrix of the estate of her deceased husband, Charles William Carter, sued Model Dairy Products Company, its truck driver, Orville B. McCoy, and Vernon A. Stallings for $40,000 for loss of her husband's life and for his funeral expenses. Charles William Carter was killed as a result of a collision between the truck in which he was a passenger and an automobile driven by Stallings. Plaintiff averred her husband's death was due to the negligence of the three parties. Before trial, the complaint was dismissed as to Stallings. The jury awarded plaintiff $40,000 against the two remaining defendants.

Defendants appeal urging these grounds for reversal: (1) Their motions for a peremptory instruction at the conclusion of the introduction of plaintiff's evidence and also at the close of all the evidence were erroneously refused; (2) they were not allowed to interrogate jurors to ascertain whether they were qualified to impartially pass on the intervening complaint of Bituminous Casualty Corporation; (3) they were denied the right to state to the jury their case relative to the alleged claim of Bituminous Casualty Corporation; (4) certain instructions offered by them were erroneously refused and certain instructions given were erroneous; (5) counsel for plaintiff was guilty of misconduct during the progress of the trial; and (6) the verdict is excessive.

The accident occurred on December 27, 1955, about 8:30 a. m., on a clear day and on a dry, two-lane, concrete-surfaced highway, some three or four miles south of Owensboro, the exact spot being where State Highway 81 is joined by the Martin Collins driveway. From the place of collision, the highway extends in an approximate straight line in each direction for at least a half mile. Three vehicles were involved; two of these were trucks travelling south, the other was an automobile going north.

Just before the accident, the milk truck owned by Model Dairy Products Company and driven by its employee, Orville B. McCoy, on a business run, was proceeding ahead of an oil field truck, a flat-bed Dodge, owned by Carl Helm and operated by his driver, Chester Carter. Charles William Carter, a brother of Chester Carter and also an employee of Carl Helm, was a passenger in the oil field truck. The automobile, operated by Vernon Stallings and coming toward the trucks, was a 1956 Pontiac. The three drivers were the only eyewitnesses to the collision.

Chester Carter, the driver of the oil field truck, testified he first noticed the milk truck moving ahead of him when some 300 to 350 feet from where the accident occurred and while making from 30 to 35 miles per hour. He stated it began gradually pulling over the center line as if to make a left turn into a driveway. He continued at the same rate of speed and in his traffic lane, intending to pass to the right of it; and then, when he was within 20 feet of the truck, it suddenly swerved back on its right side. To avoid hitting it, he took to the side of the road on his left and almost immediately collided with the Stallings automobile which was at that moment passing

the milk truck. The oil field truck was knocked into a ditch, burst into flames and he had trouble dragging his brother, who caught on fire, out of the truck. According to Carter, no signal was given by the driver of the milk truck. He said he was unable to see the Stallings automobile until the instant before he made contact with it, because the width and height of the milk truck completely blocked it from his view.

Orville McCoy, the driver of the milk truck, testified he was delivering milk at the time on his regular route. When 75 feet from the Martin Collins driveway, where he planned to turn in to make a delivery, he observed through a mirror attached to the front side of his truck the oil field truck following him. His truck had no directional rear-light indicators, so that he had to slide open the door by using a hand lever and then signal by thrusting out his arm. He stated he gave a left-turn signal by extending his arm, and began to decrease his original speed of 15 miles per hour by gently applying his brakes when 40 feet from the driveway. While performing these acts, he noticed for the first time the Stallings automobile approaching him when it was approximately 115 feet away, travelling 50 to 60 miles per hour. This caused him to slow down the milk truck to about four miles per hour in order not to by-pass his turn, and the Stallings automobile moved by him and collided with the oil field truck near the rear of his vehicle. He declared the milk truck never at any time crossed the center line into the left lane of the road.

Vernon Stallings, the driver of the Pontiac, testified that he saw the milk truck coming toward him when 300 to 500 feet from the point of collision, straddling the center line, and this prompted him to slacken his speed somewhat; that when his car and the milk truck were 100 feet apart, it swerved back into its right lane; that he then passed it and collided with the oil field truck; that he never saw the milk truck driver give a signal; that he was travelling 50 miles per hour when he came into sight of the milk truck and then

slowed to 35 miles per hour because it moved over the center line; that he did not have a view of the oil field truck until the collision for the reason that the milk truck obscured his vision; and that the collision occurred at a point near the end of the milk truck, just after the milk truck had cut completely back into the right lane and had stopped or nearly stopped.

Bituminous Casualty Corporation carried workmen's compensation insurance covering Carl Helm, the decedent's employer. The Workmen's Compensation Board awarded the widow of Charles William Carter and their two children benefits not to exceed $9,500 plus medical and funeral expenses, the whole totalling $10,075. The insurance carrier filed an intervening complaint in this action, asserting the right to reimbursement out of any judgment recovered against appellants by the administratrix. KRS 342.055 is relied upon as the basis for this right. When we mention appellee herein we refer to the administratrix, who is the real party in interest.

In arguing the trial court committed a prejudicial error in overruling their motions for directed verdicts in their favor, appellants contend Chester Carter, the driver of the oil field truck, failed to perform certain minimum statutory requirements and, if they had been complied with, the accident would not have happened. Thus, it is asserted Carter, the driver of the oil field truck, knew McCoy, the driver of the milk truck, expected to turn into the Martin Collins driveway, with the result that Carter was under a statutory duty to assist him in making that turn in safety. This duty, it is claimed, Carter ignored in his undue haste to pass the milk truck without knowing the peril that lay ahead of him. See KRS 189.350(2). It is also their position Carter violated KRS 189.340(3) in overtaking and attempting to pass the milk truck on the left side of the road without first ascertaining whether that portion of the road was free of oncoming traffic for such to be done without harm. It is maintained, too, KRS 189.340(7) (a) was not

complied with in that Carter was trailing the milk truck more closely than was prudent and at a speed that was unreasonable under the circumstances.

Appellee contends a case was made out for the jury on the question of causative negligence on the part of McCoy, the milk truck driver, and appellants were therefore not entitled to peremptory instructions. Appellee asserts McCoy violated the lookout duty, KRS 189.290(1), since he admitted he did not take note of the Stallings automobile until it was 115 feet from him, although he was at the time undertaking a left turn. Appellee further insists McCoy did not observe KRS 189.380(1) when he turned from a direct course on the left side of the road back to the right lane of traffic under hazardous circumstances without giving any visible signal. It is also maintained he created an emergency by suddenly stopping, without warning, immediately in front of the oil field truck. Appellee points out, too, that Carter had the statutory prerogative to overtake and pass to the right of the milk truck driver, when he believed clearance was being made for him in his traffic lane. It is pointed out KRS 189.340(2) specifically provides: "The operator of a vehicle may overtake and pass upon the right of another which is making or is about to make a left turn."

We shall discuss other statutory provisions pertaining to the operation of motor vehicles upon a public highway, and relied upon by one or the other of the parties hereto, which we deem relevant to the facts brought out in this case, when we come to a consideration of questions raised as to certain instructions given and refused.

■ The question of proximate cause in connection with the occurrence of an accident is one of fact to be left to the jury where such cause is open to a reasonable difference of opinion. Stated somewhat differently, the issue of proximate cause should be withheld from the jury only if there is no dispute about the essential facts

and but one conclusion may reasonably be drawn from the evidence. See Clardy v. Robinson, Ky., 284 S.W.2d 651, and Louisville & N. R. Co. v. Powers, Ky., 255 S.W. 2d 646.

■ In the case at bar, a boiled-down statement of appellants' view as to the reason for the collision is that Carter, knowing the milk truck was to turn into the Martin Collins driveway, did nothing to prevent the accident and actually did everything to cause it. Appellee's attempted explanation of the mishap is that McCoy's alleged negligence in remaining upon the wrong side of the highway until the Stallings automobile was in close proximity to it created the emergency situation which was the primary cause of the tragic occurrence. Appellee also insists the swerve back to the right and the ensuing abrupt stop were other efficient causes.

Therefore, we have before us a dispute about the essential facts as to who was liable for the accident, as regards which reasonable minds might differ, and, as a consequence, only a jury could resolve this issue. It follows the motions of appellants for directed verdicts were properly overruled.

■ The second and third grounds advanced for reversal will be considered together, as they present questions that may be given an almost identical answer. The first question concerns an attempt of appellants' counsel to ask the prospective jurors on *voir dire* whether they were financially or otherwise interested in Bituminous Casualty Corporation, a party intervenor. The next question relates to efforts of appellants' counsel to outline to the jury in their opening statement their defense to the claim of Bituminous Casualty Corporation in this action for recoupment of workmen's compensation payments previously made or to be made by it. The trial judge ruled, and correctly so, that neither of these matters should be brought to the attention of the jury.

■ It will be recalled Bituminous Casualty Corporation paid workmen's compensation benefits amounting to $10,075 to Charles William Carter's widow and their two children, and, having discharged its obligation under its insurance contract, it intervened in the instant action, pursuant to KRS 342.055, to recoup from any judgment rendered to the extent of its compensation liability. We have uniformly held that the compensation feature should play no part in the trial of a case like the one before us until the recovery of a verdict against the negligent third party. The award under KRS Chapter 342 and the payments made to or on behalf of the dependents of the deceased employee affect only the judgment to be rendered by the trial court; and the rights of the parties growing out of such award, or any payments made thereunder, should then be apportioned by the judgment entered as the respective rights of the parties may appear of record. See Berry v. Irwin, 224 Ky. 565, 6 S.W.2d 705, and Book v. City of Henderson, 176 Ky. 785, 197 S.W. 449, 451.

■ The fourth complaint is in respect to the refusal of the trial court to submit to the jury two instructions offered by appellants. In their tendered "Instruction Y", appellants requested the jury to be told in substance that if they believed Carter, the operator of the oil field truck, was negligent to the extent that his carelessness helped to bring about the accident, they should in that event return a verdict against Bituminous Casualty Corporation. We have already explained why under a well-established rule the only cause of action presented for trial before the jury was that of the deceased employee's personal representative against the alleged negligent third parties. In Book v. City of Henderson, cited above, this statement appears which is determinative of the point raised: " * * * The trial of the issues of negligence and damages, to be submitted to the jury, should not be confused by evidence or instruction with reference to the liability of the employer or

awards under the Compensation Act, because such liability and award do not depend upon the question of negligence."

■■ The lower court also declined to give "Instruction R" offered by appellants. This instruction embraced the idea that if Chester Carter and his brother, Charles William Carter, the decedent, were at the time of the accident on a joint mission, then any negligence of Chester Carter was imputable to the decedent, and the appellee-administratrix could not recover against appellants. To constitute "joint enterprise" as between the driver of the automobile and any passenger, there must be not only a community of interest but also equal right, expressed or implied, to direct and control the management and movement of the automobile. Where it appears that a passenger does not have any voice in such control and management there are lacking the elements of joint enterprise. See Adams v. Hilton, 270 Ky. 818, 110 S.W.2d 1088. Since the evidence disclosed beyond any doubt the decedent had no part in the control and management of the truck, but merely went along on it to help load and unload it, it was not error to refuse this instruction.

■ Objections are raised by appellants to many of the instructions given, and we shall deal with these in the order presented in their brief. First, as to "Instruction A", appellants claim they were prejudiced in that the word "negligently" was not used in connection with the duty owed by McCoy, the milk truck driver, while "Instruction B" used the word "negligently" in connection with the duty owed by Carter, the oil field truck driver. Appellants argue the jury was thus led to believe there were two measurements set up for guidance, a less strict one as to Carter and a more rigid one as to McCoy. Appellants rely upon Atlantic Greyhound Corporation v. Franklin, 301 Ky. 867, 192 S.W.2d 753, a skidding accident case, as authority for their position. The statutory duties imposed upon each driver, out-

lined in the two instructions given, represent legally established standards of conduct, the violation of any one of which would constitute *negligence*. A failure to perform any of the requirements set forth in the catalogue of duties imposed by Instruction A on McCoy and Instruction B on Carter would be recognized as negligence by the jury without calling it that specifically. However, if the facts in a case raise a question of coerced or involuntary violation of a duty owed, the word is properly inserted, as in the skidding case cited by appellants. Otherwise, the actor would be subjected to possible liability for something unavoidable.

■ It is next contended "Instruction A(2)" relating to McCoy's duty to keep on the right side of the road and not to pass to the left side when meeting a vehicle coming from the opposite direction was erroneous. They attack this subsection on the grounds: (a) That McCoy's operation of the milk truck had no causal connection with the accident, and (b) that travel on the left side of the road to effect a turn, as here, violated no statute or established rule of conduct unless the approaching vehicle was in such close proximity to the turning point that the person planning to change his course would be placed in peril. Appellee bases her primary right of recovery on the assumption that McCoy's manner of operating the milk truck, first on the left and then on the right side of the road and without giving any signals, brought about the accident. Appellee cites the provisions of KRS 189.380(1) as applicable. Appellee points out, too, that McCoy admitted on the witness stand the Stallings automobile was within 115 feet of the milk truck before he noticed it; and she maintains he was then on the left side of the road and therefore ignored KRS 189.300(1) which allows left turns across a highway only if the highway is clear of traffic for 150 feet ahead. It is apparent Instruction A(2) was based upon appellee's theories as to the cause of the accident and under the evidence outlined it was proper to submit her theories to the jury for consideration.

■ Appellants assert "Instruction A(4)" was erroneous in that it imposed contradictory duties on McCoy. Under this subsection the jury was told if McCoy manifested an intention to make a left turn by getting over on the left side of the road, and then abandoned making such a movement and returned wholly to his right side, he was obliged to use ordinary care to give the statutory signal before turning back to the right and, also, not to stop abruptly his vehicle immediately in front of the oil field truck. It is appellants' hypothesis that every one knew McCoy planned to turn to his left, so that only a signal in this respect was all that was required of him. However, we believe that once McCoy signaled a left turn and then changed his mind and swerved back on his right side of the road and stopped or slowed almost to a stop, which the testimony of two witnesses stated he did, it was necessary that he should make known his change of intention, in compliance with KRS 189.380(1, 3). Therefore we do not believe under the proof presented the instruction was contradictory, but that it covered certain additional duties set forth in the statutory provisions just mentioned. The instruction lay an obligation on McCoy to exercise ordinary care to give the appropriate signal, thus permitting the jury the opportunity to determine whether under the circumstances of the short distance involved McCoy had a fair chance to signal.

Subsection (b) of Instruction A(4) is criticized on the supposition that it assumed facts which were for the jury to determine. Actually the instruction expressly conditioned the imposition of certain statutory duties on McCoy on the finding by the jury that the so-called "assumed facts" were true, namely, that McCoy did, if the jury wanted to believe, drive to the left, then turned back to the

right, and finally stopped. Thus there was no error here, since, as was shown in the previous paragraph, these were issues amply developed by evidence.

■ Instruction B(2) is branded by appellants as erroneous, because it was to apply only if the jury did not believe as set forth in "Instruction D". The latter instruction stated that Carter, the oil field truck driver, was required to act only as a reasonable man would ordinarily act if he found himself in an emergency situation created by McCoy's operation of the milk truck. Appellants claim the lower court should have found as a matter of law that any emergency involving the truck Carter was driving was created by Carter himself. We believe a jury might be warranted in finding from the evidence under Instruction D an emergency was created as to Carter when McCoy suddenly pulled back to the right after indicating a plan to turn to the left, which a certain line of proof disclosed. We perceive no error in the submission of this instruction to the jury.

The position is taken by appellants that the giving of "Instruction C" was prejudicial to the substantial rights of appellants. This instruction told the jury that any negligence of Chester Carter could not be imputed to the decedent, "unless it (Carter's negligence) was the sole cause of the collision". This point has heretofore been discussed and disposed of in connection with the joint adventure theory contained in appellants' offered Instruction R. It will be recalled we held the trial judge properly excluded such a theory. As a part of this argument, the suggestion is put forward that the question of contributory negligence of the decedent should have been submitted to the jury. The record does not disclose any evidence which tends to show the decedent was contributorily negligent in respect to the accident and, as a consequence, the withholding of an instruction on this point was proper.

Appellants' final complaint as to the instructions is that the trial court emphasized parts of the evidence, to appellants' prejudice, by mentioning the turning to the left side of the highway and then back "wholly to the right side" upon the part of McCoy in Instructions A(4), A(4) (a), D and E. Under the evidence introduced, we can scarcely conceive how the instructions criticized could have been otherwise drafted than the manner in which they were drawn, so as to set before the jury clearly the factual issues to be resolved.

■ The fifth error assigned is that counsel for Mrs. Carter was guilty of misconduct during the trial and such misconduct, plus other errors herein averred, resulted in an excessive verdict. The argument is advanced that counsel played upon the jury's sympathy and directed their attention to an amount large enough to support the widow and children rather than to an amount to be determined by the loss of the earning power of decedent by: (a) Stating to the jury that the action was brought for the benefit of the widow and the two infant children of the deceased, and (b) asking Nancy Carter whether she was the widow of the deceased and whether the deceased left any children.

■ By express provision of KRS 411.130(2) (b), the widow and children share equally any recovery in a wrongful death action. As was stated in Vaughn's Adm'r v. Louisville & N. R. Co., 297 Ky. 309, 179 S.W.2d 441, 445, 152 A.L.R. 1060: "The administrator is merely a nominal plaintiff. The real parties in interest are the beneficiaries whom he represents." We know of no legal principle requiring the identity of the real parties in interest in a case of this kind to be kept a secret from a jury.

■ Another point of alleged misconduct is raised by appellants in connection with a witness who was testifying with reference to the decedent's earning power

from certain records which were kept under his supervision. When appellants' counsel objected to the manner in which the records were kept and thereby sought to attack the competency of the testimony, the administratrix' counsel said: "Well, I am sure you wouldn't like for the jury to know anything about this man." Appellant objected and moved the trial judge to admonish the jury not to consider the statement, which was all the action requested by appellants. The court promptly and properly admonished the jury not to consider the statement. It would appear this action of the court properly protected the rights of appellants and removed any prejudicial effect the remark could otherwise have had. See Scott v. Pendleton, Ky., 282 S.W.2d 55; Mahan v. Able, Ky., 251 S.W.2d 994. Furthermore, appellants secured the maximum relief they requested and we fail to understand why they now complain in this respect.

 The final argument is that the verdict is excessive. Appellants cite one case to uphold this view, namely, West Ky. Coal Co. v. Shoulders' Adm'r, 234 Ky. 427, 28 S.W.2d 479, the opinion of which held a $30,000 verdict for the death of a 32-year old laboring man was too large an allowance of damages. They do not mention the fact that the excessive-verdict opinion relied upon was written in 1930 when economic conditions were vastly different from those prevailing at present. The case at bar is not to be determined by an opinion handed down so long ago.

The decedent was 31 when he met his death and had at that time a life expectancy of 39½ years. His annual earnings (not considering outside jobs, such as the one at which he was working when killed) aggregated at least $3,600, and his prospective life earnings were therefore more than $142,000. The verdict of the jury was only $40,000. In Temperly v. Sarrington's Adm'r, Ky., 293 S.W.2d 863, a 1956 case, a verdict of $55,000 for a man

with one-half the life expectancy of Charles William Carter and an award of $20,000 for a housewife without any earnings and with one-half the life expectancy of the decedent was upheld. We conclude the award of damages is not excessive.

For the reasons set forth we believe the judgment was correct.

Wherefore, the judgment is affirmed.