ZURICH AMERICAN INSURANCE COMPANY, Movant,

v.

Desiree D. HAILE; James B. Haile, Jr.; and Joyce P. Whitehouse, Respondents.

No. 93–SC–412–DG.

Supreme Court of Kentucky.

Sept. 1, 1994.

Allan Weiss, J.D. Raine, Jr., Morris, Garlove, Waterman & Johnson, Louisville, for movant.

John M. Bush, Benjamin C. Johnson, Louisville, for respondents, Hailes.

Lee E. Sitlinger, Louisville, for respondent, Whitehouse.

LEIBSON, Justice.

This case requires us to construe the proper application of KRS 411.188, a statute relating to treatment of collateral source payments,[1] enacted in 1988 as part of House Bill 551, an omnibus package of so-called "tort reform" legislation. Ky.Acts 1988, Ch. 224, § 4. In its entirety this legislation is officially styled "AN ACT relating to civil actions."

Joyce P. Whitehouse was an employee of Norwest Financial, Inc., when, in the course of her employment, she was injured in an automobile accident occurring June 30, 1988. She sued Desiree D. Haile, driver of the allegedly offending other automobile, and her husband, James Haile, Jr. Among the items of damages for which Ms. Whitehouse filed suit against the Hailes were medical expenses and lost wages. Zurich American Insurance Co. (Zurich), her employer's workers' compensation insurance carrier, having paid the medical expenses and a portion of Ms. Whitehouse's claimed wage loss as weekly indemnity benefits filed an intervening complaint specifying its statutory subrogation rights under KRS 342.700(1) to recoup from Ms. Whitehouse's tort recovery any portion of the recovery duplicating sums it had paid as workers' compensation benefits. Its intervening complaint added that Zurich "may be required by KRS 411.188 to intervene in this action in order to protect its subrogation rights."

KRS 411.188 states as follows:

1. No issue regarding constitutionality has been raised by the litigants. However, the constitutionality of this statute has been raised as an issue in another case presently pending before our Court, and nothing stated in this opinion infers the appropriate resolution of this question.

"(1) This section shall apply to all actions for damages, whether in contract or tort, commenced after July 15, 1988.

(2) At the commencement of an action seeking to recover damages, it shall be the duty of the plaintiff or his attorney to notify, by certified mail, those parties believed by him to hold subrogation rights to any award received by the plaintiff as a result of the action. The notification shall state that a failure to assert subrogation rights by intervention, pursuant to Kentucky Civil Rule 24, will result in a loss of those rights with respect to any final award received by the plaintiff as a result of the action.

(3) Collateral source payments, except life insurance, the value of any premiums paid by or on behalf of the plaintiff for same, and known subrogation rights shall be an admissible fact in any civil trial.

(4) A certified list of the parties notified pursuant to subsection (2) of this section shall also be filed with the clerk of the court at the commencement of the action."

In Answers to Interrogatories filed by Ms. Whitehouse on May 18, 1990, she stated her claim against the Hailes included:

"Medical Expenses—$25,067.36

Lost Wages—$26,033.66 (through date of trial)

Permanent Impairment—$100,000.00

Pain and Suffering—$100,000.00"

And in answer to a further interrogatory regarding payments from collateral sources, she specified:

"Zurich American has paid medical expenses totalling $25,067.36 as of 5/18/90 and indemnity benefits totalling $2,713.24."

The case was set for trial on October 15, 1991, and on that date Zurich's intervening complaint was dismissed with prejudice immediately before the trial was to commence because Zurich was not prepared to produce evidence to prove its claim. Whether the judge meant only evidence of what Zurich had paid Ms. Whitehouse ($27,780.60 was admitted in answers to interrogatories), or meant to require Zurich to prove Ms. Haile's liability as well as Ms. Whitehouse's damages, is not clear. Shortly thereafter, in open court, Ms. Whitehouse settled her claim against the Hailes and their liability insurance carrier for $40,000, specifying "the settlement, by agreement of the parties, did not include any benefits which had already been paid to Ms. Whitehouse as workers' compensation benefits." The settlement also did not include a further claim for reimbursement for wage loss which Ms. Whitehouse had made in this lawsuit against her own automobile insurance carrier based on her no-fault ("PIP") coverage. This PIP claim had been bifurcated by a pretrial order specifying it would be "tried separately," and this PIP claim was left open by the settlement.

The trial court's final "Opinion and Order" recites:

"Both the plaintiff, Joyce Whitehouse, and the defendants, Desiree and James Haile and their insurance company, Allstate, announced ready for trial. Counsel for Zurich, workers compensation carrier for Ms. Whitehouse's employer, announced that there was no representative available from Zurich to testify directly, but that a representative was willing to testify by telephone. The Court stated that it would dismiss claims of Zurich with prejudice, due to the fact that it was not ready for trial. After dismissal, Ms. Whitehouse and the Hailes settled claims against the Hailes for $40,000, to be paid by the Hailes and Allstate.... [T]he settlement, by agreement of the parties, did not include any benefits which had already been paid to Ms. Whitehouse as workers compensation benefits."

The trial court's Opinion and Order further states:

"Zurich ... had a duty to prosecute their claim fully. Since they did not, it was within the Court's discretion to dismiss by order of the court, upon terms the Court deems proper. CR 41.01(2)."

The Court of Appeals (one judge dissenting without opinion) affirmed the trial court, stating the trial court's "action was justified" because "Zurich announced that it did not have a company representative to testify," and because Zurich "never complied" with a pretrial order which "required the parties to

provide a list of witnesses and other information in advance of the trial date." We accepted discretionary review in order to address the underlying question regarding the extent to which the statute, KRS 411.188, requires a subrogee providing collateral source payments to participate in the trial of the underlying tort action. Under KRS 411.-188, the subrogee must intervene when notified of the commencement of the action because "failure to assert subrogation rights by intervention ... will result in a loss of those rights with respect to any final award received by the plaintiff as a result of the action." Must the subrogee thereafter separately, independently and actively pursue its claim in the tort litigation?

■ Before the advent of KRS 411.188 it was abundantly clear that the only real parties in interest in presenting a tort claim were the party claiming wrongful injury and the alleged tortfeasor. The "animal" before the court was a tort and the law did not permit the insurance "tail" to wag the tort "dog." Entities paying collateral source benefits had an interest in the claimant's recovery to whatever extent the insurance contract and/or subrogation receipt so provided and assigned, but such interest was purely derivative and the collateral source payor had neither right nor interest in actively pursuing the claim against the tortfeasor unless the injured party failed to do so.[2]

■ In KRS 342.700(1), the Workers' Compensation Act utilizes these principles, providing statutory subrogation as traditionally applied to recoupment of collateral source payments by contract. In an unbroken line of cases going back fifty years to *Whitney v. Louisville & N.R. Co.*, 296 Ky. 381, 177 S.W.2d 139, 141 (1944), we have held:

"It is generally held that the usual provision in workmen's compensation statutes for the recovery by the employer or his insurance carrier from a third person liable for an employee's injury or death of compensation paid or payable does not create a new cause of action, but merely transfers the right of the recovery to the employer or insurance carrier...."

Until now, the precedent controlling the treatment of statutory subrogation under KRS 342.700(1) (and its predecessor, KRS 342.055) has been *McCoy v. Carter*, Ky., 323 S.W.2d 210, 216 (1959), which states with reference to a workers' compensation subrogation claim:

"We have uniformly held that the compensation feature should play no part in the trial of a case like the one before us until the recovery of a verdict against the negligent third party. The award under KRS Chapter 342 and the payments made to or on behalf of the ... employee affect only the judgment to be rendered by the trial court; and the rights of the parties growing out of such award, or any payments made thereunder, should then be apportioned by the judgment entered as the respective rights of the parties may appear of record."

■ Under KRS 342.690, workers' compensation is the exclusive remedy of an injured employee against an employer covered by the Act. However, in KRS 342.700(1), the injured employee retains the right "to proceed at law by civil action against such other person [as may be liable] to recover damages." If the injured employee fails to pursue this third-party liability claim, KRS 342.-700(1) further provides that then the employer or its carrier, "having paid the compensation or having become liable therefor, may recover in his or its own name or that of the injured employee from the other person in whom legal liability for damages exists, not to exceed the indemnity paid and payable to

2. The no-fault statute changed this, but only for no-fault benefits. It converts the real party in interest from the injured party to the no-fault carrier, but only by carefully spelling out that the injured party is divested of the right to sue by the no-fault law and the PIP payer (not the injured party) is the sole stakeholder. The automobile accident victim's "rights to those elements of damages covered by basic reparations benefits were abolished by KRS 304.39–060(2)(a)"; the reparations obligor is "the only party who could give the tortfeasor and his insurer a release for elements of damages covered by basic reparations benefits." *Stovall v. Ford*, Ky., 661 S.W.2d 467, 470 (1983).

the injured employee, less the employee's legal fees and expense."

■ With workers' compensation statutory subrogation, as with contractual subrogation, the insurer's right is a right to reimbursement, strictly derivative, with no right to maintain the action independently so long as the insured is pursuing the claim. We quote from *National Biscuit Co. v. Employers Mut. Liability Ins. Co.*, 313 Ky. 305, 231 S.W.2d 52, 54 (1950):

> "It is the purpose of the statute to reimburse the employer or his insurance carrier out of any recovery against the third party tortfeasor to the extent of the award made under the Workmen's Compensation Act...."

As more recently stated in *Waters v. Transit Authority of River City*, Ky.App., 799 S.W.2d 56, 58 (1990):

> "[T]he provision in the compensation act for recovery by an employer ... does not create a new cause of action, but merely transfers right of recovery.... [It does not] create a new cause of action against third parties in whom legal liability for damages exists in favor of the employer/insurance carrier...."

And in *Fireman's Fund Insurance Company v. Government Employees Insurance Company*, Ky., 635 S.W.2d 475, 476 (1982), we stated, "a compensation carrier's rights against a third-party tortfeasor are entirely derivative, and are not independent of the injured party's tort claim."

Does KRS 411.188, quoted *supra*, require a different treatment? In subsection (2) it requires the plaintiff "at the commencement of the action ... to notify, by certified mail, those parties believed by him to hold subrogation rights to any award received by the plaintiff as a result of the action," and, when notified, requires such entity to intervene or lose "those rights with respect to any final award received by the plaintiff as a result of the action." Plainly no language in this subsection nullifies the plaintiff's right to sue the tortfeasor for damages as before, including amounts for which the plaintiff has been reimbursed from collateral sources. These remain part of the tort claim whether or not the subrogee chooses to intervene when notified. Intervention serves only to protect subrogation rights. No language here specifies that the entity paying collateral source benefits, rather than the plaintiff, shall pursue the claim, as is the case with the No–Fault Act. Indeed, in many instances the plaintiff will have recovered first party benefits from collateral sources where no reimbursement is owed, either because there is no subrogation provision in the insurance contract or the payment is not pursuant to an insurance contract. Nothing in KRS 411.188 requires us to add a stipulation requiring amounts covered by collateral source payments to be pursued separately and independently in the tort action, throwing out fifty years of case law to the contrary.

To so require would create further absurd consequences. Often, collateral source benefits derive from multiple entities. Should all of them now become additional parties plaintiff in trial of the litigation? Often such payments are in amounts relatively small in cases relatively large and complex. Should the entities making collateral source payments of this nature be forced to expend litigation costs to actively participate as plaintiffs in the tort litigation, or else lose otherwise valid reimbursement rights? The practical result of adopting the trial court's approach would be cases with tort claims in the millions involving multiple subrogees with relatively minor dollars at stake who must separately prepare for trial and then independently participate, or be dismissed.

Plainly this statute was enacted primarily to benefit perennial defendants such as the insurance industry. It does so by identifying collateral source subrogees in subsection (2) and revealing collateral source payments to the jury in subsection (3), thus nullifying any natural sympathy that might otherwise attend proof of the plaintiff's losses. However, if we require insurance companies making collateral source payments to actively participate or be dismissed, the industry may well lose more than it gains from the statute. These payors will abandon their subrogation rights in many instances where payments are small compared to the size of the case, because litigation costs will exceed the value of

potential reimbursement. Further, in those instances where the subrogee abandons its claim rather than incur litigation costs, under the statute the plaintiff would effect a double recovery, a second recovery from the tortfeasor for sums to which the entity making collateral source payments would be otherwise subrogated. In the present case, once Zurich, the workers' compensation carrier, was dismissed with prejudice, the plaintiff would have been legally entitled under KRS 411.188 to try the entire claim against the tortfeasor including all medical expenses and the portion of lost wages reimbursed by Zurich. Had this case not been settled forthwith under terms excluding the amounts paid by Zurich, dismissing Zurich's subrogation claim would have resulted, quite possibly, in a windfall verdict for the plaintiff, the very same double recovery which KRS 342.700(1) was written to prevent. We are not inclined or required to interpret the statute to permit such an absurdity.

■ Nor does subsection (3) of KRS 411.188 require a different result. It specifies that "collateral source payments ... and known subrogation rights shall be an admissible fact in any civil trial." This language says nothing that transfers to the subrogee the obligation to present evidence of collateral source payments during the trial of the case against the tortfeasor. The plain meaning of subsection (3) is to permit defendants the right to introduce such evidence before the jury. Subsection (3) overturns the longstanding rule of evidence excluding as irrelevant evidence of payments to the tort claimant from collateral sources. *See Hellmueller Baking Co. v. Risen,* 295 Ky. 273, 174 S.W.2d 134 (1943); *Rankin v. Blue Grass Boys Ranch, Inc.,* Ky., 469 S.W.2d 767 (1971); and *Davidson v. Vogler,* Ky., 507 S.W.2d 160 (1974). But subsection (3) says nothing beyond stating this new rule of evidence. This section of the statute does not oblige the subrogated collateral source payor to try the case for the defendant. It has no bearing on whether a subrogee must be prepared to actively participate and independently prove the claim against the tortfeasor, or be dismissed, and we will not add such language to the statute.

■ In sum, no portion of KRS 411.188 requires or suggests why the method for permitting workers' compensation carriers to obtain reimbursement for benefits previously paid to an injured employee from the employee's judgment against the tortfeasor, as set out in *McCoy v. Carter, supra,* should be overturned. The compensation insurance carrier should intervene to notify the court of its claim for reimbursement from the plaintiff's recovery. Having notified the court by intervening complaint of such right to reimbursement, Zurich should have been entitled to reimbursement, at least to the extent of amount admitted in Ms. Whitehouse's answers to interrogatories, upon trial and a judgment which included its claim.

If, as here, the claimant and the tortfeasor elect to enter into a partial settlement excluding those items of damages for which the collateral source payor is subrogated, either before, at the commencement, or during the trial, such arrangements are not a device cutting off otherwise valid subrogation rights. The subrogated insurance carrier then should be permitted to independently pursue its assigned interest. If the subrogee's interest is sufficiently valuable to incur the litigation costs, it will separately pursue the litigation after a partial settlement. In this case the subrogated compensation insurance carrier seeks to avail itself of this right and should be permitted to do so.

For the reasons we have discussed, the chaos created by a different rule, one forcing the collateral source payor to actively and separately participate during the preparation and trial of the litigation along with the claimant who is already pursuing the larger claim for the entire loss, far outweighs the consequences incurred by permitting the subrogee to further litigate its claim if the claimant and tortfeasor reach a partial settlement. Here the litigation was not terminated in any event, because, as will be recalled, Ms. Whitehouse's wage loss claims were not limited to the alleged tortfeasor and to workers' compensation. She also had a separate indemnity claim against her own automobile insurance no-fault coverage which had been bifurcated and remained open.

■ There is one other aspect of this case we need to address. Zurich offered to present written evidence of the amounts paid in workers compensation and asked for this evidence to be stipulated. The reason offered by defense counsel for being unwilling to do so was a matter of trial strategy rather than any problem with proving the amount of the collateral source payments. When pressed at oral argument, counsel stated he needed Zurich's claims representative there to testify so he could cross-examine the claims representative about why the insurance company stopped paying temporary total disability. While Zurich's claims representative could testify to what was paid and what was not, facts which could and should have been easily stipulated, any knowledge held by the claims representative about plaintiff's underlying condition would surely be secondhand information excluded as hearsay. Further, the agent's opinions and conclusions about whether Whitehouse's medical condition warranted her taking off from work was obviously not expert testimony. The insurance company apparently paid only $2,713.24 in temporary total disability benefits, or at least that is all it had paid as of May 18, 1990. But the claims representative's lay opinion as to whether this limited amount was medically justified could not possibly qualify as trial evidence. KRS 411.188 does not elevate a claims adjuster to a medical expert. The dispute, if any, as to whether Ms. Whitehouse should have been entitled to further temporary total disability benefits falls solely within the province of the Workers' Compensation Board. It is certainly no part of this case. Even less is it a proper subject for the tortfeasor to argue about before the jury.

For all of these reasons, we conclude the trial court erred in dismissing with prejudice Zurich's claim. We reverse and remand with directions to the trial court to vacate the order dismissing Zurich's claim and to permit Zurich to go forward, if it so elects, with proof of the liability of the alleged tortfeasor and of damages to the extent of Zurich's workers' compensation insurance payments.

All concur.