SAND HILL ENERGY,
INC., Appellant,

v.

FORD MOTOR COMPANY,
et al., Appellees.

and

Brenda Smith, Administratrix of the
Estate of Tommy Smith,
Appellant,

v.

Ford Motor Company, et al., Appellees.

and

Ford Motor Company,
et al., Appellants,

v.

Brenda Smith, Administratrix of the
Estate of Tommy Smith, et al.
Appellees.

Nos. 1999–SC–1028–DG, 1999–SC–
1029–DG, 2000–SC–0444–DG.

Supreme Court of Kentucky.

May 16, 2002.

Rehearing Denied Sept. 26, 2002.

---

2. *Id.* ("Above all else, court-made law must be just.").

Clint J. Harris, Manchester, Counsel for Sand Hill Energy, Inc.

John A. Rogovin, Brian P. Brooks, O'Melveny & Myers LLP, Washington, DC, B. Todd Thompson, Sallie Jacobs Stevens, Amy Sullivan, Thompson & Miller PLC, Louisville, Counsel for Ford Motor Company, Inc.

R. Scott Madden, Ricky D. Bailey, Morgan and Bailey, Mary Latta Lee, Manchester, Sharon K. Allen, McKee, Counsel for Brenda Smith, Etc.

Hugh F. Young, Jr., Product Liability Advisory Council, Inc., Reston, VA, Virginia Hamilton Snell, Wyatt, Tarrant & Combs, LLP, Louisville, Evan M. Tager, Mayer, Brown & Platt, Washington, DC, Counsel for Product Liability Advisory Council, Inc., Amicus Curiae.

LAMBERT, Chief Justice.

Upon a jury verdict in a products liability action claiming wrongful death, the Estate of Tommy Smith ("the Estate") recovered judgment against Ford Motor Company ("Ford") for three million dollars in compensatory damages and twenty million dollars in punitive damages. The Court of Appeals of Kentucky reversed the judgment on grounds of misallocation of peremptory challenges and ordered a new trial. It did not reach the other issues raised on appeal. We granted discretionary review to the Estate on the issue decided by the Court of Appeals. We also granted Ford's cross-motion for discretionary review to consider the issues it raised on appeal. Sand Hill Energy is likewise before this Court for review of the trial court's directed verdict, affirmed *sub silentio*, rendered against it.

At the time of his death in 1993 at age thirty, the decedent was working for Sand Hill Energy, Inc., and in the process of unloading bags of ammonium nitrate from a 1977 F–250 Ford pickup truck. The vehicle was parked on a 4% downhill

grade, with the motor running and the transmission set in park. While the decedent was behind the vehicle, the transmission "migrated" from park to reverse, and the vehicle moved backwards and up the incline. Smith was slowly crushed to death against a storage shed. He was survived by his widow, Brenda Smith, and their child.

At trial, the Estate presented evidence that the Ford C–6 transmission was defectively designed by virtue of a propensity to migrate from mispositioned false park to powered reverse due to engine vibration. There was evidence that Ford had known of the propensity of the C–6 transmission for such migration for several years prior to the manufacture of the 1977 model F–250 pickup truck involved here. Ford documents bearing 1971 and 1972 dates established that Ford had received numerous customer complaints about its vehicles containing C–6 transmissions that were said to have "jumped out of park into reverse."[1] Other Ford documents reveal its understanding that the shift lever detent design "permits transmission lever placement on a 'land' between a positive park position and reverse position with the possibility of vehicle vibration moving the lever from park to reverse in an unattended vehicle."[2] These documents establish the existence of a design flaw and that Ford had knowledge of it long before the vehicle involved here was manufactured.

Ford defended on grounds that the vehicle, sixteen years old and with at least 143,000 miles at the time of the accident, was in deplorable condition. Ford contended that crucial mechanical parts were broken, misaligned, worn or loose, and that other crucial parts had been replaced with makeshift parts. It maintained that the engine and transmission had been entirely rebuilt, that there was internal and external leakage of brake fluid, and concluded that dirt, debris, and corrosion were the likely cause of the accident. Among other things, Ford produced evidence that in post-accident testing by the U.S. Mine Safety and Health Administration, when the vehicle had been placed undeniably in the park latch position, it still migrated to powered reverse on numerous occasions. On the other hand, Ford verified that if a driver shifted the transmission more than 40%, but less than 60%, of the way from reverse to park, i.e., between the reverse valley and the park valley, the transmission would then be in hydraulic neutral and might move into powered reverse due to vibration forces from the engine. It conditioned this admission upon the claim that such a design was common throughout the industry and represented the state of the art at that time.

In 1980, Ford modified the transmission design at issue here to protect against unexpected shifts from park to powered reverse. Ford was also required by virtue of a consent decree with the National Highway Traffic Safety Association ("NHTSA") to send out more than 22 million warnings of the possibility of unin-

1. Ford customer complaints regarding a 1972 Ford with C–6 transmission and 10,900 miles, a 1971 Ford with a C6 transmission and 20,074 miles, and a 1969 Mercury with a C6 transmission and 40,400 miles(from a November 28, 1972 Ford memorandum entitled "Automatic Transmissions 'Jumping Out of Park''' listing the six (6) additional cases reported in the last two (2) weeks).

2. Inter Office Communication, D.R. Dixon, Principal Engineer, Ford Classic Safety Systems Department, June 30, 1971. This document also recommends "that forward design and development be directed towards a feasible alternative which positively positions shift lever in park or reverse, to prevent a false sense of security as to transmission position."

tended park to powered reverse shifts in its vehicles.

## I. PEREMPTORY CHALLENGES

■ The Court of Appeals reversed the trial court upon its allocation of peremptory challenges and we will first address this issue. To properly analyze this issue it is necessary to examine the structure of the litigation.

Initially, the Smith Estate and two Smith individual parties brought a products liability claim against Ford and Mideast Ford Mercury, Inc. Ford then filed a third party complaint against Sand Hill Energy, Inc., the decedent's employer, because prevailing case law required active assertion of a claim to entitle Ford to an apportionment instruction.[3] In response to the third party complaint, Sand Hill brought a counterclaim against Ford alleging its liability for some $200,000 in regulatory fines and increased workers compensation costs it had incurred as a result of the accident. Thereafter, Ford dismissed its third party claim against Sand Hill. Thus, the basic structure of the litigation was that Smith sued Ford and Ford brought in Sand Hill by means of a third party complaint.[4]

At trial, however, the court restructured the case and designated the Smith Estate and Sand Hill as plaintiffs against Ford as the defendant. Ford then asserted that the Estate and Sand Hill should share peremptory challenges, but the trial court ruled otherwise and allowed the Estate and Sand Hill separate peremptory challenges.

The Court of Appeals adopted Ford's argument that at the time of trial the interests of the Smith Estate and Sand Hill were not antagonistic. The Court quoted but did not entirely observe CR 47.03(1),[5] giving little or no attention to the fact that despite restructuring at trial, the Estate and Sand Hill were opposing sides. Instead the court focused exclusively on whether they had antagonistic interests, the portion of the rule that allows separate peremptory challenges to co-parties with antagonistic interests.

There can be no doubt that the Smith Estate and Sand Hill were not co-parties but were opposing sides. While the Smith Estate did not bring an action against Sand Hill, presumably due to the exclusive remedy provision of the Workers Compensation Act,[6] Ford did bring Sand Hill before the court as a third party defendant. Its purpose may be presumed to have been to obtain an instruction allowing apportionment of all or part of the liability against Sand Hill thereby relieving Ford of any part so apportioned. As such, Ford placed the Smith Estate and Sand Hill on opposing sides, and there was no error in allowing them separate peremptory challenges.

■ While a strict application of the rule would be sufficient, we make addition-

3. *Floyd v. Carlisle Construction Co.*, Ky., 758 S.W.2d 430 (1988).

4. As no issue has been raised as to Ford's good faith in filing and then dismissing its third party complaint, we need not speak to the practice it employed. We note, however, that CR 11 requires that pleadings be in good faith.

5. CR 47.03(1) states: "In civil cases *each opposing side shall have three peremptory chal-* lenges, but co-parties having antagonistic interests shall have three peremptory challenges each."

6. The exclusive remedy provision of the Workers Compensation Act, KRS 342.690, precluded the Estate or the decedent's survivors from seeking damages from Sand Hill; *see, e.g., Shamrock Coal Co. v. Maricle*, Ky., 5 S.W.3d 130 (1999); *Zurich American Ins. Co. v. Haile*, Ky., 882 S.W.2d 681 (1994).

488

al observations that bear upon the question of proper allocation of peremptory challenges. The gist of Ford's argument is that by bringing in a third party defendant for purposes of its own and the trial court's determination, for simplicity at trial, that the third party defendant and the plaintiff should be aligned with one another, the plaintiff and the third party defendant should be required to share peremptory challenges. This argument borders on an assertion that the defendant should be able to adopt a strategy for its own benefit that simultaneously diminishes the plaintiff's ability to pursue its own strategy. At the least, this argument appears at odds with notions of fair play. A party should not be able to create a community of common interests between other parties and then assert that interest to their detriment. But for Ford's decision to bring Sand Hill before the court so that it could reduce its own exposure, there would be no question about the plaintiff's entitlement to separate peremptory challenges as Sand Hill would not be a party to the litigation.

■ Moreover, under these circumstances, it would be extraordinary to find reversible error. While it may appear in retrospect that the Smith Estate and Sand Hill lacked any substantial antagonistic interest, such could not have been known by the trial court at the time the jury was selected.[7] It has been suggested that the positions parties take at trial should determine whether they have antagonistic interests, but such a rule is utterly unworkable. At the time a trial judge must make the allocation of peremptory challenges, there can be no certainty as to what the evidence

will show or precisely what the claims or defenses will be. Moreover, the instant trial court, after having determined that by virtue of their being on different sides, entitling all parties to separate peremptory challenges, nevertheless physically separated the three parties and directed that they have no contact with one another in exercise of their peremptory challenges. We have carefully reviewed *Bowling Green Mun. Utils. v. Atmos Energy Corp.*,[8] and determined that it is factually distinguishably from this case in that the parties to whom were awarded the excessive number of peremptory challenges were all plaintiffs, most of whom were represented by the same counsel. Accordingly, we reverse the Court of Appeals on the peremptory challenges issue and affirm the actions of the trial court in this respect.

## II. ADMISSIBILITY OF EXPERT TESTIMONY

■ Of the issues presented by Ford on cross-appeal, we will first address the admissibility of the testimony of the Smith Estate's expert, Melvin Richardson. It should be noted at the outset that Richardson is the holder of a B.S. in mechanical engineering from Clemson University, a Master's degree in mechanical engineering from North Carolina State University, and a Master's degree in applied mathematics and a Ph.D. in engineering mechanics from the University of Alabama. From 1965 to 1985, he taught various mechanical engineering courses at Clemson University and since 1981 has investigated and analyzed

7. *Mackey v. Greenview Hospital, Inc.*, Ky.App., 587 S.W.2d 249, 259 (1979), makes it clear that the time for determining the allocation of peremptory challenges is when the jury is selected. Despite subsequent dismissal of physician cross-claims, the *Mackey* Court re-

lied on the existence of cross-claims at the time the trial commenced as a factor establishing antagonism of interests.

8. Ky., 989 S.W.2d 577 (1999).

numerous accidents and incidents in which the Ford C–6 transmission was implicated.

Under prevailing law, a pivotal event in litigation where expert testimony under KRE 702 is proffered is the so-called "Daubert hearing." This Court has embraced *Daubert v. Merrell Dow Pharmaceuticals*[9] and its progeny including *Kumho Tire v. Carmichael.*[10] Our most recent encounter with the law in this area is *Goodyear Tire and Rubber Co v. Thompson.*[11] These cases, while identifying "nonexclusive factors," to be considered by the trial court, all emphasize the gate-keeping function of the trial court and reiterate the considerable breadth of discretion possessed by trial courts.[12] The admissibility standard to be applied has been described as flexible, permitting the trial court to broadly analyze the proffered testimony to discover whether it bears appropriate indicia of reliability.[13] With the admissibility standard described above, a reviewing court must, of necessity, give great deference to the trial court's ruling and reverse only in circumstances of clear abuse.[14]

The claim by the Smith Estate was that the Ford C–6 transmission produced and installed in the 1977 Ford vehicle was defective by virtue of a "false park" transmission position. Under this contention, a vehicle operator could set the transmission in what appeared to be park, but was actually a "land" between park and reverse, and due to vibration from the engine, the transmission setting could vibrate into powered reverse.

At the Daubert hearing, Dr. Richardson testified to his academic background and teaching experience. He testified to extensive study of the C–6 type transmissions and stated that he had investigated such transmissions as an engineer since 1981. He had tested transmission production units and had done a complete engineering analysis of the shift characteristics of the Ford C–6 transmission. He had compared Ford transmissions with those of other manufacturers.

Ford attacks Dr. Richardson's testimony on grounds that it failed to satisfy the five Daubert factors. It urges a determination of trial court error on grounds of failure to apply these factors to the admission of the Richardson testimony.

The trial court was fully cognizant of its role as gatekeeper. An extensive Daubert hearing was held in which Dr. Richardson testified and was subjected to cross-examination. A key question in the Daubert analysis is whether the theory advanced can be or has been tested. While Dr. Richardson acknowledged not having tested his alternative design, it appears that such would have been unavailing as Ford changed the design in 1980 and adopted changes similar to those proposed by Richardson. The trial court was aware of this as the issue of admissibility of subsequent remedial measures was also before the court on Ford's motion to exclude such evidence.[15] While not having recited findings of fact, the trial court clearly considered all relevant questions and determined that the proffered testimony satisfied the requirements of Kentucky law as embodied in KRE 702. The trial court was aware of the difference between its role as

9. 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

10. 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

11. Ky., 11 S.W.3d 575 (2000).

12. *Goodyear* at 578.

13. *Id.*

14. *Goodyear* at 577–578.

15. *See* KRE 407.

gatekeeper and the jury's role in determining the weight evidence should have.

Our recent decision in *Goodyear v. Thompson* emphasizes repeatedly the discretion of the trial court with respect to the admission or exclusion of expert testimony under KRE 702. There was no abuse of that discretion here.

## III. SUFFICIENCY OF THE EVIDENCE

■ Ford claims trial court error for failure to grant its motion for a directed verdict at the close of the evidence. The Court of Appeals did not reach the issue as it had reversed the judgment on other grounds. Ford sought review and the issue of sufficiency of the evidence is properly before this Court.

We have a number of recent decisions articulating the standard by which we review trial court rulings on motions for directed verdict.[16] The prevailing standard is concisely stated in *Lewis v. Bledsoe Surface Mining*,[17] as follows:

> Upon review of the evidence supporting a judgment entered upon a jury verdict, the role of an appellate court is limited to determining whether the trial court erred in failing to grant the motion for directed verdict. All evidence which favors the prevailing party must be taken as true and the reviewing court is not at liberty to determine credibility or the weight which should be given to the evidence, these being functions reserved to the trier of fact. Kentucky & Indiana Terminal R. Co. v. Cantrell, 298 Ky., 743, 184 S.W.2d 111 (1944), and Cochran v. Downing, Ky., 247 S.W.2d 228 (1952). The prevailing party is entitled to all reasonable inferences which may be

drawn from the evidence. Upon completion of such an evidentiary review, the appellate court must determine whether the verdict rendered is " 'palpably or flagrantly' against the evidence so as 'to indicate that it was reached as a result of passion or prejudice.' " NCAA v. Hornung, Ky., 754 S.W.2d 855, 860 (1988). If the reviewing court concludes that such is the case, it is at liberty to reverse the judgment on the grounds that the trial court erred in failing to sustain the motion for directed verdict. Otherwise, the judgment must be affirmed.[18]

Ford makes a multi-faceted attack on the evidence offered by the Estate. Primarily, it relies on the age of the vehicle (seventeen years old at the time of the accident) and its significant state of disrepair, and it also claims alteration of the vehicle. Ford also claims a failure of proof of causation. Evidence on behalf of the Estate was presented primarily by its expert witness, Dr. Richardson. Richardson essentially made the case for the Estate, and his testimony, along with the testimony of Ford's experts, answered the contentions Ford makes here. Concerning the condition of the transmission, Richardson testified that despite its age, the relevant parts worked as they did when new by virtue of being sent from the factory in a way a re-builder cannot change. He claimed the underlying defect was unaffected by the age and repair condition of the vehicle. Ford's experts confirmed the propensity of the C–6 transmissions to be mispositioned allowing migration from the false park position to powered reverse. As to possible remedies of the transmission defect, Richardson proposed creating

---

16. *NCAA v. Hornung*, 754 S.W.2d 855, 860 (1988); *Bierman v. Klapheke*, 967 S.W.2d 16, 18–19 (1998).

17. Ky., 798 S.W.2d 459 (1990).

18. *Id.* at 461–462.

a greater distance between the reverse and park positions and a deeper detent at the park position. This alternative design was not inconsistent with the proposal made by Ford engineer D.R. Dixon by memorandum dated December 8, 1971, nor with the design change Ford made in 1980 according to Ford expert Lee Carr. In sum, there was evidence from Dr. Richardson and Ford's engineers that the C–6 transmission was defectively designed to create a false park position creating the propensity upon engine vibration for the transmission to self-shift from false park or to powered reverse.

When all is said and done, the Estate presented substantial evidence of a design defect and some evidence that the cause of the accident was mispositioning of the gear shift on the land position permitting vibration into powered reverse. Ford presented evidence that the vehicle was in a dreadful state of disrepair and some evidence that the gear shift was placed correctly in the park position. With the evidence in such a state, the jury might have found for either side. As this Court said in *Coleman v. Baker*: [19]

> Reasonable probability is all that is required of evidence in order to support a factual conclusion. 20 Am.Jur. 1099, 1101 (Evidence, §§ 1248, 1250). "Evidence reasonably tending to prove the essential facts, either directly or indirectly, or by permissible inference, is sufficient to sustain a judgment. * * * And essential facts may be proved by circumstantial evidence in which event it is not necessary that proof rise to a degree of certainty which will exclude every other reasonable conclusion than the one reached by the jury." [20]

There was no error in the trial court's refusal to grant a directed verdict.

## IV. AVAILABILITY OF PUNITIVE DAMAGES

■ As stated at the outset, the jury returned a verdict for punitive damages of twenty million dollars. The Court of Appeals did not reach this issue because it had reversed and remanded on the allocation of peremptory challenges. Ford brought the issue to this Court through its cross-motion for discretionary review.

At the time this case was tried, the controlling legal standard for punitive damages in Kentucky was found in KRS 411.184(1)(c) and required a determination that the defendant acted with "flagrant indifference to the rights of the plaintiff and with a subjective awareness that such conduct will result in human death or bodily harm." We have held this statute to be unconstitutional,[21] but in this case, no issue was raised as to the constitutionality of the statute and the case was tried upon the statutory standard. "Since neither of the parties challenged the constitutionality of the statute at trial and since the statute was in effect at the time of the accident and the trial, [this Court] will review the question under the terms of the statute as it then existed." [22]

Ford broadly attacks the legitimacy of the award of any punitive damages in this case. It contends that a determination by the National Highway Traffic Safety Administration which entered into a settlement agreement with Ford and, by the terms of such agreement, required only a mailed reminder instead of a recall, demonstrates that it could not have acted with

**19.** Ky., 382 S.W.2d 843 (1964).

**20.** *Id.* at 847–848.

**21.** *Williams v. Wilson*, Ky., 972 S.W.2d 260 (1998).

**22.** *Atmos Energy*, 989 S.W.2d at 580.

malice. Ford also claims a finding of malice is precluded by its conformity to industry standards. While there was evidence that Ford C–6 transmissions experienced more park to reverse incidents than those of its competitors, Ford attacks such evidence as being statistically unsound even though some such evidence came from NHTSA documents. As a further explanation, Ford also contends that it received more consumer complaints than its competitors because it aggressively investigated and solicited information about park to reverse incidents. As additional basis for claiming that malice was not shown, Ford contends that at most there was a reasonable disagreement among informed persons as to the best product design, and that when reasonable persons can disagree, a finding of malice is precluded. Finally, Ford argues, perhaps disingenuously, that it should not have been subjected to punitive damages "because the only evidence introduced by plaintiff to show 'malice' concerned prior incidents of unattended rearward movement involving Ford vehicles. Presumably, plaintiff hoped to show by implication that Ford must have known of a 'defect' because it had received complaints of unattended rearward movement." Citing David G. Owen, *Problems in Assessing Punitive Damages Against Manufacturers of Defective Products*,[23] it concludes, "but 'the bare fact of [even] a large number of product failures . . . falls

far short of establishing the manufacturer's flagrant culpability in selling the product." In this vein, Ford insists that it behaved as a responsible corporation by aggressively undertaking actions to discover the cause of the failure and ameliorate its consequences. Based on this conduct, Ford insists that no reasonable jury could have concluded that it acted with malice.

It is true that during the seven or eight year period between 1972 and 1980, Ford studied the possibility of a new design, responded to a NHTSA investigation, and entered into a settlement agreement with NHTSA whereby Ford agreed to mail reminders to drivers advising them not to leave running vehicles unattended, to secure parking brakes, and to shift fully into park. The Smith Estate, however, presented evidence that in 1970 Ford began receiving complaints concerning incidents of unintended migration from park to powered reverse. Among other things, the Estate produced four exhibits bearing 1971 and 1972 dates from Ford engineers articulating problems with the C–6 transmission and disclosing numerous customer complaints of "jumped out of park into reverse" or some similar terminology. Of the exhibits, a memorandum from principal engineer D.R. Dixon is extraordinary in its description of the flaw, recognition of driver misuse, and recommendation of an alternative.[24] From the evidence, a jury could have believed that by November

---

**23.** 49 U. Chi. L.Rev. 1, 23–28 (1982).

**24.** The text of the Dixon memorandum, with diagram omitted, is as follows:
Current Chassis shift lever detent design permits transmission lever placement on a "land" between a positive park position and reverse position with the possibility of vehicle vibration moving the lever from part to reverse in an unattended vehicle.
[Diagram] Shift lever-spring loaded against insert plate in improper position which appears to customer as proper.

*Present Condition*
Present customer usage patterns indicate that this condition of careless shift lever actuation is occurring frequently in the field with actual high accident incidence.
It is recommended that forward design and development be directed toward a feasible alternative which positively positions shift lever in park or reverse, to prevent a false sense of security as to transmission position.

1972, Ford was well aware of the flaw in its C–6 transmission, but that it continued producing and installing such transmissions until 1980, thus acting with flagrant indifference to the lives of its consumers.

## V. PUNITIVE DAMAGE INSTRUCTIONS

■ We have considered Ford's contention that the trial court erred with respect to the punitive damages instruction it gave. A practice of long-standing in this Court's jurisprudence, indeed a venerated practice, is the giving of "bare-bones" instructions.[25] The instructions given here were taken from Palmore's *Kentucky Instructions to Juries*[26] and included the language of KRS 411.186. Moreover, counsel for the Estate reminded the jury time and again that the purpose of punitive damages was to punish wrongdoing. We discern no shortcoming in the instructions given that violates the standards set forth in *Hanson v. American Bank,*[27] nor has any other argument been advanced sufficient to persuade us to re-examine our long-standing practices and the authorities upon which they are based.

## VI. AMOUNT OF PUNITIVE DAMAGES

■ We now turn to the issue of whether the amount of punitive damages was excessive, requiring that it be modified or vacated. For years this Court observed the "first blush" rule which focused on whether the amount of punitive damages appeared to have been given under the influence of passion or prejudice and in disregard of the evidence.[28] This rule was modified in *Davis v. Graviss*[29] and *Cooper v. Fultz*[30] where we distanced appellate courts from a direct review of the sum awarded. Instead, we imposed on the trial court the responsibility to analyze whether the award was given improperly, and reserved to appellate tribunals the responsibility to review for abuse of discretion.

> The appellate court no longer steps into the shoes of the trial court to inspect the actions of the jury from his perspective. Now the appellate court reviews only the actions of the trial judge to determine if his actions constitute an error of law. There is no error of law until the trial judge is said to have abused his discretion and thereby render his decision clearly erroneous.[31]

■ In May of 2001, however, the role of appellate courts was changed by the Supreme Court of the United States where federal constitutional questions are preserved and presented for review. No longer may appellate courts defer to trial courts on questions of excessiveness of punitive damages and limit their review to abuse of discretion. We must now return to our former role and review the amount of punitive damages *de novo.*[32] In *Cooper*

**25.** *King v. Ford Motor Company,* 209 F.3d 886 (6th Circuit 2000); *Smith v. Louis Berkman Co.,* 894 F.Supp. 1084 (W.D.Ky.1995); *Young v. J.B. Hunt Transportation,* Ky., 781 S.W.2d 503 (1989); *Cox v. Cooper,* Ky., 510 S.W.2d 530 (1974); *Collins v. Galbraith,* Ky., 494 S.W.2d 527 (1973).

**26.** John S. Palmore and Ronald W. Eades, *Kentucky Instructions to Juries,* Vol. 2, Civil.

**27.** 865 S.W.2d 302 (1993).

**28.** *See, e.g., Koch v. Stone,* Ky., 332 S.W.2d 529, 532 (1960).

**29.** Ky., 672 S.W.2d 928 (1984).

**30.** Ky., 812 S.W.2d 497 (1991).

**31.** *Prater v. Arnett,* Ky.App., 648 S.W.2d 82, 86 (1983).

**32.** *Cooper v. Leatherman,* 532 U.S. 424, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001).

*v. Leatherman,*[33] the Supreme Court held that

> the Due Process Clause of the Fourteenth Amendment to the Federal Constitution imposes substantial limits on that [state law] discretion. That Clause makes the Eighth Amendment's prohibition against excessive fines and cruel and unusual punishment applicable to the States. *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) *per curium.* The Due Process Clause of its own force prohibits the states from imposing "grossly excessive" punishment on tortfeasors.[34]

On remand to the United States Court of Appeals for the Ninth Circuit, the Court directed that "the *de novo* standard should govern its decision." [35]

In *Leatherman,* the Court re-iterated its reliance on the three factors set forth in *BMW v. Gore* as appropriate for consideration by appellate courts as they undertake the process of *de novo* review.[36] The *Gore* factors are 1) the degree of reprehensibility of the defendant's misconduct, 2) the disparity between the harm (or potential harm) suffered by the plaintiff and the punitive damages awarded, and 3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases.[37]

As to the degree of reprehensibility of Ford's conduct, we conclude that it was substantial. There is no doubt that for at least seven years after Ford knew of the dangerous propensities of the C–6 transmission, it continued producing and installing it in its vehicles. The vehicle which killed Tommy Smith was a 1977 model manufactured five or more years after Ford knew of the dangerous propensity of its transmission. Ford attempts to explain its conduct by relying on the absence of a NHTSA recall, by a reliance on industry standards, and by characterizing its conduct as a "good faith judgment call." [38] The fact remains, however, that by Ford's own engineers and through many consumers, some of whom were maimed or killed, Ford was forcefully informed that its transmission was dangerous.

We must also consider the disparity between the harm suffered by the plaintiff and the punitive damages awarded. The harm to Tommy Smith was death. The harm to his estate was the total destruction of his power to labor and earn money. It would be impossible to overstate the degree of harm. On the other hand, substantial compensatory damages were awarded and the amount of punitive damages was almost seven times compensatory damages.[39] We note that in *Leatherman* and *Gore,* the amount of punitive damages awarded was a far greater multiple of

---

**33.** *Id.*

**34.** *Id.* at 1684.

**35.** *Id.* at 1689.

**36.** *Id.* at 1687.

**37.** *BMW v. Gore,* 517 U.S. 559, 574–575, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996); *Leatherman* at 1687.

**38.** We have addressed the industry standards defense in *Owens–Corning v. Golightly,* Ky.,

976 S.W.2d 409 (1998), and *Jones v. Hutchinson,* Ky.App, 502 S.W.2d 66 (1973). In *Owens–Corning,* we said:

> The purpose of KRS 411.310(2) is not to insulate an entire industry from liability just because every member of that industry was manufacturing and distributing a product known to be inherently dangerous.

*Owens–Corning* at 411.

**39.** Specifically, the $3 million in compensatory damages included $2 million for loss of earning capacity and $1 million for pain and suffering.

compensatory damages than appears here,[40] but we also note that those cases involved relatively small sums in compensatory damages for economic loss, and that to achieve any real punishment, a substantial multiple would be required.

The third *Gore* factor is the difference between the punitive damages awarded and the civil penalties authorized or imposed in similar cases.[41] Ford argues that neither federal nor state penalties for violations of the type at issue here authorize any such award as returned by the jury. It also contends that our prior jury verdicts provided no warning that Ford might be subjected to a $20 million penalty. It points to the $5 million punitive damage judgment upheld in *Hanson v. American Bank*[42] as the largest punitive damage verdict ever affirmed on appeal in Kentucky.

Ford's view of this factor is far too restrictive. This Court is not confined to a review only of Kentucky verdicts and decisions as we consider whether Ford had fair warning that it might be subjected to a significant penalty in a Kentucky court. Ford is a multi-national corporation that is frequently involved in litigation throughout the United States in state and federal courts. It possesses a wealth of information as to settlements, verdicts, and trial and appellate court decisions. Ford knew or should have known of the potential for a substantial verdict when its defectively designed vehicle caused the death of a Kentucky consumers. Its national experience and the experience of other automobile manufacturers were sufficient to acquaint it with the reality.[43] While Ford is correct that our decision in *Hanson v. American Bank* is the largest punitive damage award ever finally affirmed by Kentucky courts, it is also true that this Court has in recent years encountered punitive damages in several cases and shown no particular disinclination to uphold such awards where the evidence justified it. In *Owens–Corning v. Golightly*,[44] we affirmed a judgment of $290,000 in compensatory damages and $435,000 in punitive damages.[45] We also held that successive awards of punitive damages for the same course of conduct did not violate the Due Process Clause.[46] In *Kroger v. Willgruber*,[47] we affirmed a judgment of $500,000 in punitive damages for intentional infliction of emotional distress, and in *Farmland Mutual Insurance*

**40.** In *Leatherman,* the amount of punitive damages awarded ($4.5 million) was ninety (90) times the amount of compensatory damages ($50,000). In *Gore,* the amount of punitive damages ($4 million) was one thousand (1,000) times the amount of compensatory damages ($4,000). In this case, as mentioned above, the amount of punitive damages was somewhat less than seven times the amount of compensatory damages.

**41.** *Gore* at 575, 116 S.Ct. 1589.

**42.** Ky., 865 S.W.2d 302 (1993). We recognize that our decision here amounts to a modification of the rule applied in *Hanson v. American National Bank.* In our view, however, the *Hanson* rule has been superceded by the Supreme Court of the United States in *Cooper Industries v. Leatherman, supra,*

**43.** *See, e.g., Ford Motor Co. v. Nowak,* 638 S.W.2d 582 (Tex.App.1982)($4 million in punitive damages on facts similar to these was affirmed); *Hasson v. Ford Motor Co.,* 32 Cal.3d 388, 185 Cal.Rptr. 654, 650 P.2d 1171 (1982)($4 million in punitive damages upheld); *Ford Motor Co. v. Ammerman,* 705 N.E.2d 539 (Ct.App.Ind.1999)(punitive damage judgment of $13.8 million affirmed on appeal).

**44.** Ky., 976 S.W.2d 409 (1998).

**45.** *Id.* at 410, 413–15.

**46.** *Id.* at 412–413.

**47.** Ky., 920 S.W.2d 61 (1996).

*Company v. Johnson,*[48] we affirmed a punitive damages judgment of $2 million for bad faith and violation of the Kentucky Unfair Claims Settlement Practices Act.

Our recent decision in *Owens–Corning v. Golightly* contains an excellent analysis of Kentucky law on review of punitive damage awards as it existed prior to *Cooper Industries v. Leatherman.* We determined that, contrary to the position of Owens–Corning, our process of review was not constitutionally infirm. *Owens–Corning* amounts to a concise statement of the requirements of our law as it existed when this case was tried. We are confident the trial judge discharged his duty to review under the "first blush" rule. In discharge of our new responsibility to review the amount of the punitive damages award *de novo,* we have considered the factors set forth in *BMW v. Gore* and a number of decisions from other jurisdictions. We recognize the flexibility of the *Gore* factors and that no court has yet discovered an infallible constitutional line or simple mathematical formula for determining whether an award of punitive damages is proper.[49] We observe that many of the cases reversed on appeal for excessive punitive damage awards were cases involving purely economic loss as opposed to loss of life or bodily injury.[50] Our decision in *Golightly* restated a view long held in Kentucky law as to the assessment of punitive damages.

> In Kentucky, the assessment of punitive damages requires consideration of not only the nature of the defendant's act, but also the extent of the harm resulting to the plaintiff. *Fowler v. Mantooth,* Ky., 683 S.W.2d 250, 253 (1984). In

other words, the jury is to consider not only the defendant's conduct, but the relationship of that conduct to the injury suffered by this particular plaintiff.[51]

This is not inconsistent with the Gore standards.

Upon all of the foregoing, and in discharge of our duty of *de novo* review under *Cooper Industries v. Leatherman,* and recognizing that substantial compensatory damages were awarded, we are of the opinion that $5 million of the punitive damages award should be set aside. We hereby affirm the judgment as to $15 million in punitive damages. As no issue was raised as to the amount of compensatory damages awarded, we will affirm that portion of the trial court's judgment.

## VII. SAND HILL DIRECTED VERDICT

■ At trial, the court granted Ford's motion for directed verdict against Sand Hill Energy, Inc. As earlier stated, Ford brought Sand Hill into the litigation by means of a third party complaint. Sand Hill counterclaimed against Ford for damages sustained in the nature of regulatory fines and increased Workers' Compensation premium costs. Sand Hill reasoned that but for Ford's defective design of the C–6 transmission, the accident would not have occurred and it would not have incurred the enhanced costs. Sand Hill presented evidence that as a result of the accident with Tommy Smith, it had been required to pay an administrative fine of $15,000; that its Workers' Compensation premiums had increased by approximately $35,000. We believe this evidence is suffi-

**48.** Ky., 36 S.W.3d 368 (2000).

**49.** *Gore* at 582, 116 S.Ct. 1589.

**50.** *See, e.g., Inter Med. Supplies v. EBI Med. Sys.,* 181 F.3d 446, 465–67 (3d Cir.1999);

*Denesha v. Farmers Ins. Exch.,* 161 F.3d 491, 502–05 (8th Cir.1998).

**51.** *Golightly* at 412.

cient to permit Sand Hill to be heard on its claim and that the trial court erred in directing a verdict against it. While the parties have not raised any issue as to the applicability of principles of collateral estoppel, on remand, the trial court should consider whether it will be necessary to retry the question of whether the C–6 transmission was defectively designed.

## VIII. CONCLUSION

For the reasons set forth hereinabove, the opinion of the Court of Appeals is reversed. The judgment of the trial court of $3 million in compensatory damages and $15 million in punitive damages,[52] plus interest and costs, is reinstated. The judgment of the trial court, affirmed *sub silento*, granting a directed verdict against Sand Hill Energy, Inc., on its claim is reversed and remanded to the trial court for further consistent proceedings.

LAMBERT, C.J., and KELLER, STUMBO, and WINTERSHEIMER, JJ., concur.

KELLER, J., files a separate concurring opinion.

COOPER, J., files a separate dissenting opinion in which GRAVES and JOHNSTONE, JJ., join.

GRAVES, J., files a separate dissenting opinion in which COOPER and JOHNSTONE, JJ., join.

KELLER, Justice, concurring.

I concur with the majority and vote to reverse the Court of Appeals and reinstate the trial court's judgment. I write separately, however, as to Part I of the majority opinion because I do not agree with the majority's conclusion that the trial court correctly allocated the peremptory challenges authorized by CR 47.03[1] when it permitted the Smith Estate ("the Estate") and Sand Hill Energy, Inc. ("Sand Hill") to exercise a total of eight (8) peremptory challenges by allowing each party separately to exercise four (4) peremptory challenges. As the Estate and Sand Hill were neither opposing parties nor had interests antagonistic to each other, the trial court should have allocated them a total of four (4) peremptory challenges to be exercised jointly. Although I acknowledge that this Court has held that trial court error in the form of allowing excessive peremptory challenges constitutes reversible error without a showing of prejudice,[2] I believe that belief is based on a fundamental mischaracterization of the entitlement to peremptory challenges, and I would review the error[3] under CR 61.01. Ford Motor Company ("Ford") has neither alleged, nor

---

**52.** *See, supra,* p. 496.

**1.** CR 47.03(1)-(2):
   (1) In civil cases each opposing side shall have three peremptory challenges, but co-parties having antagonistic interests shall have three peremptory challenges each.
   (2) If one or two additional jurors are called, the number of peremptory challenges for each side and antagonistic co-party shall be increased by one.

**2.** *Bowling Green Municipal Utilities v. Atmos Energy Corp.,* Ky., 989 S.W.2d 577, 580 (1999) ("Violations of CR 47.03, in order to be subject to appellate reversal, need not show actu-

al prejudice. A simple violation suffices."); *Kentucky Farm Bureau Mut. Ins. Co. v. Cook,* Ky., 590 S.W.2d 875, 877 (1970). *See also Davenport v. Ephraim McDowell Mem. Hosp.,* Ky.App. 769 S.W.2d 56, 59 (1989).

**3.** Although I am somewhat amazed and dismayed that I must do so, I emphasize that the trial court's improper allocation of peremptory challenges was simply an *error*—not, as caustically implied by the dissenting opinion, part of a conscious attempt by the Kentucky courts to take from the rich and give to the poor a la Robin Hood and his band of Merry Men.

demonstrated, how it suffered prejudice from Sand Hill's independent exercise of peremptory challenges, and I believe the trial court's error neither was "inconsistent with substantial justice"[4] nor "affect[ed] the substantial rights of"[5] Ford. Accordingly, I concur in the result reached by the majority.

In large part, this Court has applied a rule of automatic reversal in civil cases when trial courts have erroneously awarded excessive peremptory challenges because the Court has labeled the exercise of such challenges as "substantial rights."[6] For reasons that I have articulated previously,[7] I find that premise faulty—peremptory challenges are not substantial rights. I will not burden this dissent by restating my position, however, because even if I accept—for the sake of argument, of course—the premise that the entitlement to exercise peremptory challenges constitutes a "substantial right," I would reverse the decision of the Court of Appeals because the trial court's error in this case did not affect Ford's power to exercise peremptory challenges. This Court's prior opinions that have presumed prejudice in cases such as this have simply adopted the reasoning from other, analytically distinct, cases in which a litigant was arguably denied the entitlement to exercise the peremptory challenges authorized by court rule.[8] Harmless error review is, in my view, certainly appropriate in cases, such as this one, where the trial court's error in the allocation of peremptory challenges does not prevent a party from exercising the number of peremptory challenges authorized by the rules but rather merely allows a party or parties to exercise an excessive number of such challenges.

4. CR 61.01.

5. *Id.*

6. *Bowling Green Municipal Utilities v. Atmos Energy Corp.,* supra note 2 at 580 ("[S]ince this Court has elevated the provision of CR 47.03 to the level of being a *substantive right,* we must declare the actions of the trial court to be reversible error[.]" (emphasis added)); *Kentucky Farm Bureau Mut. Ins. Co. v. Cook,* supra note 2 at 877 ("As long as they are retained as part of the trial process, however, we believe that their proper allocation between litigants is a *substantial right* which so pervades the process that its erroneous application requires reversal as a matter of law if the issue is properly preserved by the adversely affected litigant." (emphasis added)) *Thomas v. Commonwealth.,* Ky., 864 S.W.2d 252, 259 (1993), cert. denied, 510 U.S. 1177, 114 S.Ct. 1218, 127 L.Ed.2d 564 (1994) ("The rules specifying the number of peremptory challenges are not mere technicalities, they are *substantial rights* and are to be fully enforced." (emphasis added)); *Olympic Realty Co. v. Kamer,* 283 Ky. 432, 141 S.W.2d 293, 297 (1940) ("[T]he right to challenge a given number of jurors without showing cause is one of the most important rights to a litigant; any system for the empaneling of a jury that prevents or embarrasses the full, unrestricted exercise of the right of challenge must be condemned; ...; the terms of the statutes with reference to peremptory challenges are *substantial* rather than technical[.]" (emphasis added)).

7. *Stopher v. Commonwealth,* Ky., 57 S.W.3d 787, 813–817 (2001) (Keller, J. dissenting). As to Justice Cooper's insinuation of inconsistency, *see Gamble v. Commonwealth,* Ky., 68 S.W.3d 367, 374–5 (2002) (Keller, J., dissenting) ("Although, [in *Stopher*], I expressed my intention to follow this Court's precedent until a majority of the Court elects to adopt my view, I now realize that I cannot fulfill my oath of office by closing my eyes, reversing a jury verdict that resulted from a fair trial, and remanding the case for *another* fair trial." (footnote omitted)).

8. *See Thomas v. Commonwealth, supra* note 6 (holding that a defendant was denied the number of peremptory challenges procedurally allocated to him when forced to use peremptory challenges on jurors who should have been excused for cause); *Olympic Realty Co. v. Kamer, supra* note 6 (holding that the right to exercise peremptory challenges was compromised when a juror gave false information during voir dire).

We must remember that, "[t]he right of peremptory challenge is not of itself a right to *select*, but a right to *reject* jurors." [9] In this case, CR 47.03 entitled Ford to remove four (4) jurors by peremptory challenge. It is undisputed that Ford did so, and, as such, Ford was fully afforded the "substantial right" afforded to it by CR 47.03. The trial court's erroneous decision to allow the Estate and Sand Hill to exercise a total of eight (8) peremptory challenges did not affect Ford's entitlement to excuse four (4) jurors. The contention that Sand Hill's exercise of peremptory challenges may have affected the composition of the jury that tried the case [10] erroneously characterizes the nature of the entitlement to peremptory challenge:

> The right, therefore, of challenge, does not necessarily draw after it the right of selection, *but merely of exclusion. It enables the [litigant] to say who shall not try him; but not to say who shall be the particular jurors to try him.* The law presumes, that every juror sworn in the case is indifferent and above legal exception: for otherwise he may be challenged for cause. What jurors, in particular, shall try the cause, depends on the order in which they are called; and the result is *a mere incident* following the challenges, and not the absolute selection of the [litigant] resulting from his power of challenge.[11]

Our civil rules entitled Ford to remove four (4) jurors by peremptory challenge, but gave Ford no *right*, substantial or otherwise, to have the case tried by any particular twelve (12) jurors. Accordingly, this Court should review the error in this

**9.** *United States v. Marchant & Colson*, 25 U.S. 480 at 482, 6 L.Ed. 700, 12 Wheat. 480 (1827) (emphasis added). The contrary authority cited by Justice Cooper in his dissenting opinion, *Williams v. Pichard*, 150 Fla. 371, 7 So.2d 468 (1942), appears to adopt a different line of reasoning in conflict with the views of the United States Supreme Court. However, even the Florida courts have subsequently rejected this reasoning. *See Bailey v. Deverick*, 142 So.2d 775 (Fla.App.1962), in which the Court held that changes in Florida's statute governing peremptory challenge deprived *Williams v. Pichard* of precedential effect. The Court then held:

> Seldom, if ever, will excusal of a juror constitute reversible error *for the parties are not entitled to have any particular juror serve.* They are entitled to have only qualified jurors. No complaint is made here that the jurors who served were not qualified.
>
> Under the general rule that error in a matter concerning a jury must be prejudicial to be reversible, the allowance of an excessive number of peremptory challenges is not a ground for a reversal of the judgment based upon the verdict rendered where it appears that the jury was impartial.

*Id.* at 777 (emphasis added and citations omitted). Although the *Bailey v. Deverick* court did not indicate it as a quotation, the first paragraph quoted above comes from *Piccott v. State*, 116 So.2d 626 (Fla.1960), a Florida Supreme Court case rendered after *Williams v. Pichard*. In *Nowling v. Williams*, 316 So.2d 547 (1975), the Florida Supreme Court quoted from *Piccott v. State* and cited *Bailey v. Deverick* with approval. *Id.* at 550.

**10.** In this case, however, the trial court's jury selection procedure could have seated the exact same jury even if the trial court had properly required Estate and Sand Hill to exercise a total of four (4) peremptory challenges. The trial court narrowed the jury panel to thirty-two (32) jurors, *see* KRS 29A.060(2)(a), before allowing the parties to exercise a total of (12) peremptory challenges. The parties used their challenges to exclude twelve (12) distinct jurors, leaving twenty (20) jurors, and the trial court randomly excluded six (6) jurors before seating fourteen (14) jurors to try the case. The element of randomness prevents any generalizations about how changes in the allocation of peremptory challenges would change the composition of the jury actually seated.

**11.** *United States v. Marchant & Colson, supra* note 9 (emphasis added).

case—one that permitted the Estate and Sand Hill to exercise excessive peremptory challenges, but did not restrict Ford's right to exercise the peremptory challenges authorized by CR 47.03—to determine whether Ford was prejudiced by the improper allocation. CR 61.01 contains no separate rule of "presumed prejudice" for trial court errors involving the allocation of peremptory challenges, and instead states:

> [N]o error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or setting aside a verdict or for vacating, modifying, or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does no affect the substantial rights of the parties.[12]

While Justice Cooper's dissenting opinion argues that harmless error review is inappropriate for errors in the allocation of peremptory challenges because such errors implicate a party's constitutional rights and because of the difficulty of demonstrating prejudice, neither argument provides a basis for this Court to ignore the plain terms of CR 61.01. First, even if we overlook the complete dearth of authority to support Justice Cooper's novel suggestion that the United States Constitution requires a rule of automatic reversal in cases where a trial court improperly allocates peremptory challenges, the fact remains that "even errors of a constitutional magnitude may be held harmless."[13] Secondly, I find it ironic that Justice Cooper's dissenting opinion references the will-o'-the-wisp because it is his allegation of unprovable prejudice that constitutes an illusion that misleads the relevant inquiry. The suggestion that reversal is required whenever a trial court erroneously allocates peremptory challenges simply "elevates form over substance and detracts from the true question of whether the trial court seated a fair and impartial jury."[14]

Here, the trial court's error does not justify reversal because the case was tried before a fair and impartial jury:

> Where a disqualified juror is put on a jury, it is of course error; but, where a qualified juror is improperly rejected, it is a wholly different thing. In such case the man taking his place is qualified and unexceptionable. Is he not as good a juror as the excluded one? Has not the party had what the law designs—a trial by an impartial jury? If you set aside the verdict, upon a new trial he cannot get that rejected man. Is that man better than all the balance of the citizens of the State qualified for jury service? Shall a long, costly trial be upturned for such a cause only to give the party what he has already had—a fair jury? Is the administration of justice to bear the odium of such technicality?[15]

I believe Kentucky should join the ranks of those jurisdictions that require a showing of prejudice before reversing a jury verdict when a trial court erroneously allocates peremptory challenges,[16] because I

**12.** CR 61.01.

**13.** *Jackson v. Commonwealth,* Ky.App., 717 S.W.2d 511, 514 (1986) (citing *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)).

**14.** *Stopher v. Commonwealth, supra* note 7 at 817 (Keller, J., dissenting).

**15.** *Thompson v. Douglass,* 35 W.Va. 337, 13 S.E. 1015, 1016 (W.V.1891).

**16.** *See* G.R. Jacobi, Annotation, *Effect of Allowing Excessive Number of Peremptory Challenges,* 95 A.L.R.2d 975 §§ 3 & 4 (1970).

believe it is a mistake for this Court to presume prejudice from an undisputably harmless technical violation. "[T]he law is concerned . . . with the fairness of the trial and the impartiality of the jurors [rather] than with the particular jurors who compose the jury and render the verdict[ ]," [17] and while it has been said that "[t]he purpose of the peremptory challenges is to afford parties a fair trial on the issues to be tried," [18] it is a party's right to make unlimited challenges for cause, that, both in theory and in practice, secures a fair trial by removing from consideration of the case those jurors that cannot be fair and impartial.

For the reasons stated, I find that the granting of the excessive peremptory challenges in this case constituted harmless error. Accordingly, I concur in the result reached by the majority.

COOPER, Justice, dissenting.

In its haste to place its imprimatur on this outrageous verdict by a Clay County "runaway" jury and, presumably, to redistribute the wealth of an out-of-state corporation with requisite deep pockets to stimulate the economy of eastern Kentucky, the majority opinion ignores the facts of this case, our own long-standing precedents, and the Equal Protection and Due Process Clauses of the Fourteenth Amendment of the United States Constitution as interpreted by the United States Supreme Court.

This accident occurred on September 2, 1993, at a strip mine site owned by Sand Hill Energy, Inc., near Mud Lick in Clay County, Kentucky. This particular site was a new operation that Sand Hill had only opened in August 1993, a few weeks prior to the accident. Tommy Smith was hired by Sand Hill as a general laborer on August 27, 1993, six days prior to the accident. His rate of pay was $7.50 per hour for an average work week of 51.5 hours. The extent of his education was not established. He was thirty years old and had previously worked in a sawmill, in his father-in-law's retail store, in a cabinet shop, and as a general construction laborer. Although a life expectancy of 42.8 years was stipulated, no evidence was introduced to extrapolate Smith's earning potential from his education and work history or to otherwise prove the value of the loss of his power to labor and earn money, which, of course, is the measure of damages for wrongful death. *Luttrell v. Wood*, Ky., 902 S.W.2d 817, 819 (1995); *Dept. of Ed. v. Blevins*, Ky., 707 S.W.2d 782, 783 (1986). Smith's wages and hours at the time of his death, including overtime, would have produced a gross income of $22,327.76 per year. That income maintained over 42.8 years would have produced a total gross income of $955,628.12. Despite any evidence to support a larger award, the instructions to the jury did not limit the maximum award to the amount proven, and the jury's verdict awarded Smith's estate the sum of two million dollars ($2,000,000.00) for the loss of his power to labor and earn money.[1]

17. *Stevens v. Union Railroad Co.*, 26 R.I. 90, 58 A. 492, 498–499 (1904).

18. *Penker Const. Co. v. Finley*, Ky., 485 S.W.2d 244, 249–250 (1972). Although *Thomas v. Commonwealth, supra* note 6 at 259, erroneously cites *Penker Const. Co.* as reversing the trial court "for denying full exercise of peremptory challenges because prejudice is presumed," the *Penker Const. Co.*

Court actually affirmed the jury verdict and held that "the basic issues were such that we find no error in the failure of the trial court to give each defendant three peremptory challenges."

1. Despite the fact that a wrongful death action cannot be prosecuted by the decedent's estate and amounts recovered under the wrongful death act are not payable to the

Wayne Napier, vice-president of Sand Hill and the foreman/supervisor of the Mud Lick strip mine operation, testified that on the morning of September 2, 1993, he instructed Smith to load twenty-five bags (1,250 pounds) of ammonium nitrate from a free-standing semi-trailer used for the storage of explosives onto a 1977 Ford F–250 pickup truck for transport to another location on the mining site. When he returned some time later, Napier found Smith pinned between the closed doors of the storage trailer and the rear end of the pickup truck. The truck's engine was running, and the vehicle was "quivering." Napier jumped into the cab of the truck, instinctively shifted the transmission to "drive," and moved the vehicle several feet away from the trailer, releasing Smith's body. Smith was unconscious and not breathing. Napier thought he felt a pulse in Smith's arm and unsuccessfully attempted cardiopulmonary resuscitation (CPR). Napier testified that he did not know whether Smith was alive or dead during any of this time. Smith was transported by ambulance to a local hospital where he was pronounced dead. It was stipulated at trial that Smith's death was caused by injuries sustained in the accident but that "there is a dispute as to the exact time of death after the accident occurred." No medical testimony was presented in this case, and no other evidence was offered to prove that Smith survived the initial impact or, if he did so, that he ever regained consciousness.

"There can be no award for pain and suffering during a state of unconsciousness, as pain must be experienced." 22 Am.Jur.2d *Damages* § 241 (1988). Thus, "[p]ain and suffering are not proper elements of damages where the decedent was unconscious from the time of the injury until death occurred, for the reason that there was no consciousness of any pain." *Id.* § 249 (citing cases from Arkansas, Connecticut, Hawaii, Louisiana, Maryland, Massachusetts, New York, Pennsylvania, South Dakota and Texas, and a federal case interpreting the law of Wisconsin). The burden of proof was on the estate to introduce evidence not only that the decedent lived for some period of time after the accident, but also that he was conscious and suffered pain after the injury and before death. *Ory v. Libersky*, 40 Md. App. 151, 389 A.2d 922, 928 (1978); *see also Nye v. Commonwealth, Dept. of Transp.*, 331 Pa.Super. 209, 480 A.2d 318, 321 (1984); *Canales v. Bank of Calif.*, 316 S.W.2d 314, 319 (Tex.Ct.Civ.App.1958). Despite the absence of any such proof, a verdict was rendered, and judgment was entered awarding the Smith estate one million dollars ($1,000,000.00) for pain and suffering. *Worldwide Equipment, Inc. v. Mullins*, Ky. App., 11 S.W.3d 50, 61 (1999) (no damages are recoverable for pain and

estate, KRS 411.130, *Napier's Adm'r v. Napier's Adm'r*, 210 Ky. 163, 275 S.W. 379, 380 (1925), *Rhodes v. Rhodes*, Ky.App., 764 S.W.2d 641, 643 (1988), the wrongful death portion of this action was prosecuted by the "Estate of Tommy Smith," and the entire judgment, including the judgment for wrongful death damages, was awarded to the estate. The parties listed as plaintiffs in the caption of the Complaint were "Estate of Tommy Smith, individually, Brenda Smith, his widow, individually, and Kristen Smith, an infant by and through her next friend, Brenda Smith, jointly, severally and individually." The estate's

claim for damages was not only for pain and suffering and for medical and burial expenses (damages properly recoverable by the estate) but also for damages for the destruction of Tommy Smith's power to labor and earn money (damages not recoverable by the estate). Brenda and Kristen Smith, individually, both sought damages only for loss of consortium. The caption did not list Brenda Smith as a party plaintiff in her capacity as personal representative, and the judgment was not awarded to her in that capacity or otherwise.

suffering absent evidence that the decedent survived the initial impact).

Twenty-five bags of ammonium nitrate were found in the bed of the pickup truck, and the 48-inch wide doors to the storage trailer were closed when Smith's body was found. From these facts, the Mine Safety and Health Administration (MSHA) investigators concluded that Smith had finished loading the bags of ammonium nitrate onto the pickup truck, pulled the vehicle forward at least four feet to create clearance to close the doors of the storage trailer, exited the pickup truck but left the engine running, closed the doors to the trailer, then was killed when the pickup truck suddenly moved backwards and crushed him against the storage trailer. The pickup truck's parking brake was not engaged because it had been rendered inoperable in an earlier accident.

Tests run on the 1977 Ford F-250 pickup truck during the MSHA investigation showed that, if left in "park" with the engine running, the vibration of the engine would sometimes cause its transmission to shift into hydraulic "reverse" which, in turn, caused the truck to move backwards at a quick speed. (There was no evidence at trial to support the majority opinion's factual assertion that "Smith was slowly crushed to death." Op., at 486. That "fact" is found only in the closing argument of the Smith estate's attorney.) Disassembly of the steering column and transmission system revealed that crucial parts, including those vital to the operation of the transmission, were broken, misaligned, worn, or loose, and that others had been replaced with makeshift parts. Both the transmission and the engine had been entirely rebuilt. There was internal and external leakage of brake fluid, and the master cylinder reservoir was virtually empty. Dirt, debris and corrosion were present inside the transmission. The T-bolts, the

flange casting, and the insert plate were loose, and the shift linkage was out of adjustment. MSHA fined Sand Hill $15,000.00 for three violations of the Mine Safety and Health Act, 30 U.S.C. § 801, *et seq., viz:*

1. Citation No. 4040480 was issued for the vehicle being left unattended with the park brake not set, in violation of 30 CFR 77.1607(n);

2. Citation No. 4041303 was issued for the automatic transmission gear shift mechanism being worn out and the indicator not synchronizing properly, in violation of 30 CFR 77.404(a);

3. Citation No. 4041301 was issued for the park brake being inoperative on the 1977 Ford, Model F-250 truck, in violation of 30 CFR 77.1605(b).

The jury found that the accident was caused solely by the defective design of the transmission system installed by Ford in the F-250 pickup truck at the time it was manufactured in 1977. In addition to the compensatory damages discussed above, the Smith estate was awarded the further sum of twenty million dollars ($20,000,-000.00) (!) in punitive damages. Without reaching the merits of the case, the Court of Appeals reversed for a new trial because of the improper allocation of peremptory strikes. The majority of this Court now reverses the Court of Appeals and affirms the jury's verdict as to liability while paying lip service to *Cooper Industries, Inc. v. Leatherman Tool Group, Inc.,* 532 U.S. 424, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001). It also reinstates Sand Hill's claim for damages for increased workers' compensation insurance premiums that it paid after the accident and the $15,000.00 fine imposed by MSHA as a result of the accident. From these erroneous decisions, I am compelled to dissent.

## I. FORD'S ENTITLEMENT TO A DIRECTED VERDICT.

The burden of proof was on the Appellants to prove at trial not only (1) the existence of a defective design, but that (2) the defect caused the accident and (3) a reasonable alternative design would have prevented the accident. *Midwestern V.W. Corp. v. Ringley*, Ky., 503 S.W.2d 745, 747 (1973); Restatement (Third) of the Law of Torts § 2(b), cmt. d (A.L.I.1998). KRS 411.310(1) creates a presumption rebuttable by a preponderance of the evidence (as opposed to the "bursting bubble" approach otherwise established by KRE 301) that a product is not defective if the injury, death or property damage occurred either five years after the date of its sale to a consumer or eight years after the date of its manufacture. The F–250 pickup truck involved in this accident was manufactured by Ford in 1977 and sold new that same year by Ford's local dealer, Mid–East Ford Mercury, Inc., to Alan "Peewee" Smith. The vehicle was equipped with a C–6 model automatic transmission and a transmission selector mechanism (gear shift) mounted on the steering column. Peewee Smith drove this vehicle 143,000 miles before selling it to his employer, Sand Hill Energy, Inc., in January 1993. Smith testified that, during the more than fifteen years that he owned the vehicle, he never experienced a "park-to-reverse" incident such as demonstrated by the MSHA inspectors after this accident.

In the early 1980s, the shift socket casting on the vehicle's steering column broke, resulting in a total inability to shift the transmission into "park" (as opposed to a "false park" situation where the transmission, having been shifted into "park," would migrate back into "reverse"). Peewee Smith replaced the shift socket casting himself, which required him to disassemble and reassemble the entire steering column. He had never before disassembled a steering column and did not refer to the Ford instructional manual when he did so on this occasion. In 1984 or 1985, Smith had the vehicle's transmission rebuilt by Oscar's Transmission, a local automobile mechanical shop that was not an authorized Ford repair facility. In 1986, Smith purchased a 1979 power steering unit from a local salvage yard and installed it in the pickup truck as a replacement for the original unit. Because the 1979 unit was different from the 1977 unit, it did not fit this truck, so Smith welded a metal bracket onto the unit to hold it in place. Also in the 1980s and after the truck had been driven more than 100,000 miles, Smith removed the entire engine and had it rebuilt by another local automotive mechanical shop that also was not an authorized Ford repair facility. Smith reinstalled the rebuilt engine himself. Later, the shift socket casting he had previously installed broke, and he replaced it himself, again disassembling and reassembling the steering column. Thus, at the time Peewee Smith sold this vehicle to Sand Hill in January 1993, the original shift socket casting had been replaced twice, the transmission system had been rebuilt, the engine had been rebuilt, and the power steering unit had been replaced with a salvage unit that did not fit this truck.

KRS 411.320 provides that a manufacturer is not liable for damages substantially caused by unauthorized alteration or modification of the product whether or not the manufacturer was at fault or the product was defective. That statute is a reiteration of our common law.

It has long been the law of this Commonwealth that a manufacturer is not liable when the injuries result from the mutilation or alteration of the chattel. Such intervening conduct severs any

causal connection between the product and the injury.

*Monsanto Co. v. Reed,* Ky., 950 S.W.2d 811, 814 (1997).

Wayne Napier testified that he had driven this particular Ford F–250 on numerous occasions during the eight months the vehicle was owned by Sand Hill and had never experienced a "park-to-reverse" incident, nor had any such incident been reported to him. He admitted on cross-examination that Sand Hill did not use the vehicle on the open road but only to transfer explosives and equipment from one place to another on the strip mine site. On one occasion prior to September 2, 1993, the underside of the vehicle collided with an object with such force that the collision snapped an emergency brake cable, rendering the emergency brake system inoperable. This damage was not repaired; thus, when this accident occurred, there was no emergency brake available to prevent the vehicle from backing into Tommy Smith and crushing him to death.

### A. No design defect.

Naturally, the majority opinion focuses on the testimony of the estate's professional witness, Melvin Richardson, who testified that the accident was caused by a design defect in the C–6 model automatic transmission originally installed in this particular Ford F–250 pickup truck at the time of its manufacture in 1977. Of course, even though the jury instructions required a finding that the defect in the truck's automatic transmission existed "at the time the truck was manufactured by Ford," the automatic transmission that was in the truck at the time of the accident was not the same as had been installed in the truck "at the time the truck was manufactured by Ford" in 1977, but as modified by Peewee Smith, himself, and as rebuilt by Oscar's Transmission in the mid–1980s. Nevertheless, Richardson testified that

many C–6 transmissions manufactured by Ford were defective in that, if a driver shifted the transmission more than 40%, but less than 60%, from "reverse" to "park," the transmission would remain in hydraulic "neutral" and could, after some delay, migrate back into hydraulic "reverse" due to engine vibration.

Significantly, Richardson admitted that if this particular truck had been properly maintained and if Smith had shifted the transmission all the way into "park," the accident would not have occurred. Significant, because the tests run on the vehicle by the MSHA inspectors immediately after the accident revealed that *even when the vehicle was shifted all the way into "park."* engine vibration would cause the transmission to migrate into "reverse" and the vehicle to resultantly and suddenly travel backwards at a quick speed. *Ipso facto,* if the accident was caused by the defect observed during the tests conducted immediately after the accident by MSHA, the accident was not caused by the design defect described by Richardson. More plausibly, it was caused either by defects resulting from incompetent repairs performed or defective parts installed while the truck was owned by Peewee Smith, or, possibly, as a result of the accident that disabled the emergency brake after it was sold to Sand Hill.

Wayne Napier testified that, when he shifted the transmission into "drive" so as to release Tommy Smith's pinned body, he did not notice whether the transmission had been in "park" or "reverse;" thus, contrary to factual assertions in the majority opinion, slip op., at 2, there was no proof at trial either that Tommy Smith set the transmission in "park," or that the accident was caused by the "park-to-reverse" phenomenon described by Richardson. Finally, if this accident was caused by the alleged design defect testified to by

**506**

Richardson, it would be incredible that the "park-to-reverse" phenomenon would manifest itself for the first time on September 2, 1993, sixteen years and 143,000 miles after the vehicle was manufactured. In summary, Richardson's theory and opinion were not supported by the facts proven in this case. Thus, Appellants did not prove that this accident was caused by a design defect in the manufacture of this vehicle, and Ford's motion for a directed verdict should have been granted.

*B. No competent evidence of reasonable alternative design.*

Richardson posited that a proper design would have been to increase the distance between the "park" and "reverse" gears, which would require the driver to shift the transmission even farther in order to exceed hydraulic "neutral" and reach "park." (Richardson did not explain how requiring the driver to shift the transmission farther would make it more likely that the driver would complete the shift as opposed to shifting to only 60% of completion. The exact opposite seems more likely.) Richardson admitted that his proposal had never been tested, subjected to peer review, or otherwise proven to be more effective at preventing human error than the design that was used. Nor was there any evidence that his proposed design had been accepted by experts in the field of automotive engineering design. In fact, Richardson had never even reduced his proposal to a sketch, much less a design blueprint. Clearly, Richardson's testimony as to his proposed design was not of sufficient scientific reliability to satisfy KRE 702, as interpreted in *Mitchell v. Commonwealth,* Ky., 908 S.W.2d 100 (1995), *overruled on other grounds, Fugate v. Commonwealth,* Ky., 993 S.W.2d 931 (1999), and *Goodyear Tire and Rubber Co. v. Thompson,* Ky., 11 S.W.3d 575 (2000), adopting *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). The absence of any competent evidence of a reasonable alternative design also entitled Ford to a directed verdict.

*C. Conformance to then-existing state of the art.*

Richardson admitted that in 1977, all four major American automobile manufacturers equipped their vehicles with automatic transmissions having the same design as the transmission installed by Ford in this particular F–250 pickup truck. KRS 411.310(2) creates a presumption rebuttable by a preponderance of the evidence that a product is not defective if it "conformed to the generally recognized and prevailing standards or the state of the art in existence at the time the design was prepared, and the product was manufactured." While an industry cannot set its own standards by uniformly adopting careless methods, *Owens–Corning Fiberglas Corp. v. Golightly,* Ky., 976 S.W.2d 409, 411 (1998), *Jones v. Hutchinson Mfg., Inc.,* Ky., 502 S.W.2d 66, 70 (1973), the statute "protect[s] a manufacturer from liability for failure to anticipate safety features which were unknown or unavailable at the time the product in question was manufactured and distributed." *Golightly, supra,* at 411. In the early 1980s, the United States Department of Transportation, National Highway Traffic and Safety Administration (NHTSA), conducted an extensive investigation of allegations of "park-to-reverse" incidents involving transmissions installed by all major automobile manufacturers during the period 1966 to 1980 and concluded that no safety recall was warranted. 49 U.S.C. §§ 30118 and 30120 require the issuance of a recall upon a finding of a safety-related defect. Since the C–6 transmission conformed to recog-

nized and prevailing standards in existence at the time of its manufacture and installation and since the NHTSA's investigation did not establish that the design was sufficiently unsafe to warrant recall, Ford was entitled to the statutory presumption and to a directed verdict on this issue.

## II. PEREMPTORY STRIKES.

### A. *The plurality opinion.*

The Court of Appeals correctly concluded, and a majority of this Court agrees, that the trial judge improperly allocated four peremptory strikes each to the Smith estate and Sand Hill Energy, Inc. The Smith estate was precluded from suing Sand Hill by reason of the "exclusive remedy" provision of the Kentucky Workers' Compensation Act. KRS 342.690(1). Ford, however, filed a third-party complaint against Sand Hill for contribution with respect to any amounts it might be required to pay the estate. CR 14.01; *Burrell v. Electric Plant Bd.*, Ky., 676 S.W.2d 231 (1984), *overruled on other grounds, Dix & Assocs. Pipeline Contrs. v. Key*, Ky., 799 S.W.2d 24 (1990). Ford admits that it filed the third-party complaint for the sole purpose of obtaining, at worst, an apportionment of causation against Sand Hill that might reduce its own liability for any judgment rendered in favor of the Smith estate. KRS 411.182; *Baker v. Webb*, Ky. App., 883 S.W.2d 898 (1994). Sand Hill then counterclaimed against Ford seeking recoupment of the $15,000.00 fine assessed against it by MSHA and the increased workers' compensation premiums it paid after September 1993. Sand Hill's counterclaim did not assert any negligence or

causation on the part of Smith and, in fact, alleged that "the total cause of the damages to the plaintiffs, Estate of Tommy Smith, et al., was solely by the negligence in the design or manufacture, or both, of the vehicle by Ford Motor Company . . . ."

When Ford subsequently dismissed its third-party complaint against Sand Hill,[2] the trial judge entered an order realigning the parties so as to correctly identify Sand Hill as a party plaintiff in recognition of the facts that there were no longer any claims pending against Sand Hill and that it remained a party to the action solely for the purpose of litigating its claims against Ford. The posture of the parties at that point was the same as if Sand Hill had filed an intervening complaint against Ford but not against the Smiths. Civil Rule 47.03(1) and (2) provide:

> (1) In civil cases each opposing side shall have three peremptory challenges, but co-parties having antagonistic interests shall have three peremptory challenges each.

> (2) If one or two additional jurors are called, the number of peremptory challenges for each side and antagonistic co-party shall be increased by one.

Until today, we have always held this language to mean that "each party in cases involving multiple parties is entitled to three challenges *only if* the interests of the parties are antagonistic and their defenses inconsistent." *Penker Const. Co. v. Finley*, Ky., 485 S.W.2d 244, 249 (1972) (emphasis added). *See also Bowling Green Mun. Util. v. Atmos Energy Corp.*, Ky., 989 S.W.2d 577, 579 (1999) (error to

---

**2.** It is doubtful that this procedure of filing and then voluntarily dismissing a third-party complaint suffices to require an apportionment instruction against the dismissed third-party defendant. KRS 411.182(1) does not address this issue, and a voluntary dismissal by the third-party plaintiff could be interpret-

ed as a "release" that would discharge the third-party defendant "from all liability for contribution" pursuant to KRS 411.182(4), thus eliminating the basis for apportionment. *See Degener v. Hall Contracting Co.*, Ky., 27 S.W.3d 775, 778–79 (2000).

grant separate peremptory strikes to multiple plaintiffs who sued the same defendants for various categories of damages resulting from a gas explosion and who claimed no negligence on the part of any of the plaintiffs because their interests were not antagonistic); *Kentucky Farm Bur. Mut. Ins. Co. v. Cook,* Ky., 590 S.W.2d 875, 876 (1979) (error to grant additional peremptory strikes to multiple defendants with identical trial positions); *R.E. Gaddie, Inc. v. Evans,* Ky., 394 S.W.2d 118, 120 (1965) ("in the absence of any antagonism shown between the trial positions of [the two plaintiffs] it was error to let them have three challenges apiece"); *District Union Local 227, etc. v. Fleischaker,* Ky., 384 S.W.2d 68, 72 (1964) (multiple defendants asserting a common defense did not have antagonistic interests, thus, were not entitled to separate peremptory strikes); *Davenport v. Ephraim McDowell Mem. Hosp., Inc.,* Ky.App., 769 S.W.2d 56, 59 (1988) (defendants who did not have claims against each other and who shared the same theory of the case were not entitled to separate peremptory strikes because their interests were not antagonistic). The plurality opinion makes a half-hearted and legally unsupportable attempt to distinguish *Bowling Green Municipal Utilities v. Atmos Energy Corp., supra,* and ignores all of the other precedents cited above, then mistakenly relies on *Mackey v. Greenview Hospital, Inc.,* Ky.App., 587 S.W.2d 249 (1979), to justify its departure from the requirements of this Court's own rule, CR 47.03. At the time the jury was selected in *Mackey,* the multiple defendants who were granted separate peremptory strikes had cross-claims against each other and had been separately sued for independent acts of negligence. Neither of those facts were present in *Bowling Green Municipal Utilities* or in the case *sub judice.*

The plurality opinion agrees with the holding in *Mackey, supra,* that the determination of whether the parties' interests are antagonistic must be made at the time the jury is selected, not before and not afterward. *Id.* at 259. However, the plurality posits that the trial judge in this case could not have known at the time this jury was selected that the Smith estate and Sand Hill did not have antagonistic interests. In fact, we have no way of knowing what the trial judge knew or believed with respect to this issue because, despite extensive pre-trial arguments by the attorneys for all three parties, he simply awarded the estate and Sand Hill separate peremptory strikes without addressing the issue of whether their interests were antagonistic. What he must have known, however, was that, at the time this jury was selected, the estate and Sand Hill each had a claim against Ford and neither had a claim against the other; each claimed that Ford's negligence was the sole cause of the accident and that neither Smith nor Sand Hill was at fault; each predicated Ford's liability on the same theory, *i.e.* negligent product design; and each intended to rely on the same expert, Melvin Richardson, to prove that theory.

In its pre-trial argument on this issue, Sand Hill's theory of its antagonism against the Smith estate was that Tommy Smith's minor child, Kristen Smith, could potentially reinstate her previously dismissed claim for loss of consortium per *Giuliani v. Guiler,* Ky., 951 S.W.2d 318 (1997), which was rendered only four days before this trial began. Of course, KRS 342.690(1) precludes not only the employee, but also his "legal representative, husband or wife, *dependents, next of kin,* and *anyone otherwise entitled to recover damages* " from suing the employer, *i.e.,* Sand Hill; and, if the child should sue Ford, the positions of the estate, Sand Hill and Ford with respect to apportionment of liability

would be the same as in the present case. In fact, absent reversal for a new trial, relitigation of the issue of causation among these parties would be precluded by the principle of issue preclusion. *Sedley v. City of West Buechel,* Ky., 461 S.W.2d 556 (1971). Regardless, the child's potential claim is no more antagonistic to Sand Hill now than it would have been had her claim been tried jointly with that of the Smith estate.

In its pre-trial argument, the Smith estate's expressed theory of its antagonism against Sand Hill was that any time there is an apportionment of fault, there is antagonism among all parties against whom causation is alleged. However, that would be true only if the otherwise unantagonistic parties were alleging fault against each other. From the day this action was filed until today, both the Smith estate and Sand Hill have continued to assert that there was no contributory fault on the part of Sand Hill for failing to repair the inoperable handbrake, *but see* KRS 189.090(3)(e); and that there was no contributory fault on the part of Smith for permitting the vehicle to stand unattended with the engine running, *but see* KRS 189.430(3). The Smith estate had no motive to place any blame on Sand Hill because it was precluded by KRS 342.690(1) from recovering any damages that might be apportioned against Sand Hill. And Sand Hill had no motive to place any blame on Smith because it had no claim against the Smith estate and any apportionment of causation against Smith would reduce the amount of Sand Hill's recovery against Ford.

Finally, the Smith estate argued (and the plurality opinion buys it, op., at 487) that it would be simply "unfair" to allow Ford to implead an extra party, then require the plaintiff to share its strikes with the impleaded party. Of course, the allocation of peremptory strikes is determined by CR 47.03, not by what a party or the trial judge might perceive as unfair. *Bowling Green Mun. Util. v. Atmos Energy Corp., supra,* at 579. Furthermore, this argument ignores the fact that Ford dismissed its third-party complaint against Sand Hill prior to trial. Sand Hill was a party at trial *only* because of its assertion of an independent claim for damages against Ford. Thus, as the trial judge correctly recognized when he realigned the parties, the posture of this case at trial was the same as if Sand Hill had filed an intervening complaint against Ford. Under that circumstance, there would have been no question about separate peremptory strikes. Nor should there have been any question under the facts as they existed when the jury was impaneled.

The plurality opinion's "coparties" analysis makes no sense. Coparties are parties who are either both plaintiffs or both defendants and who do not have adverse claims against each other. *Cf. Gish Realty Co. v. Central City,* Ky., 260 S.W.2d 946, 950–51 (1953), *quoting,* annotation, 297 Ky. 309, 179 S.W.2d 441, 152 A.L.R. 1060 (1944). Obviously, the Smith estate and Sand Hill were "coparties" for purposes of CR 47.03(1) at the time this jury was selected.

*B. The concurring opinion.*

As noted, *supra,* a majority of this Court agrees with the Court of Appeals that the Smith estate and Sand Hill were improperly allocated eight peremptory strikes instead of the four to which they were jointly entitled. Unfortunately, Justice Keller votes to reverse the Court of Appeals because of his notion that the failure to allocate peremptory strikes in accordance with CR 47.03 (or, in a criminal case, RCr 9.40)

is essentially "no harm done." [3] His theory is that a party who can prove an erroneous allocation of peremptory strikes is entitled to relief only if that party can also prove that an unfit person actually served on the jury. That fact, of course, is like ignis fatuus, a will-o'-the-wisp incapable of proof.

In his similar dissent in *Stopher v. Commonwealth, supra,* note 3, Justice Keller reported that he had carefully reviewed the videotape of the voir dire of the jury and was unable to determine that any juror who sat on that case was unfit to do so. *Id.* at 813. Of course; for otherwise, the provably unfit juror would have been removed for cause. Provable unfitness, however, is not the premise for peremptory strikes. Peremptory strikes permit parties to excuse from the panel a limited number of "persons thought to be inclined against their interests," though the suspected bias is insufficiently provable to warrant removal for cause. *Holland v. Illinois,* 493 U.S. 474, 480, 110 S.Ct. 803, 808, 107 L.Ed.2d 905 (1990); *see generally, Swain v. Alabama,* 380 U.S. 202, 219–20, 85 S.Ct. 824, 835, 13 L.Ed.2d 759 (1965), *overruled on other grounds, Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

> [A party] may have the strongest reasons to distrust the character of a juror offered, from his habits and associations, and yet find it difficult to formulate and sustain a legal objection to him. In such cases, the peremptory challenge is a protection against his being accepted.

*Hayes v. Missouri,* 120 U.S. 68, 70, 7 S.Ct. 350, 351, 30 L.Ed. 578 (1887). A peremptory strike is often exercised upon the "sudden impressions and unaccountable prejudices we are apt to conceive upon the bare looks and gestures of another." *Lewis v. United States,* 146 U.S. 370, 376, 13 S.Ct. 136, 138, 36 L.Ed. 1011 (1892) (citing 4 *Blackstone's Commentaries* 353).

It is this very premise of the peremptory strike, *i.e.,* the right to remove a person suspected of bias that cannot be specifically proven, that belies the theory that a misallocation of peremptories does not warrant reversal absent proof that a biased juror actually sat on the case. And that is why we have consistently held that the "harmless error" rule embodied in CR 61.01 and RCr 9.24, cannot be applied to this type of error.

> The requirement of a showing of actual prejudice effectively nullifies the requirements of the rule on allocation of peremptory challenges. To show actual prejudice, the complaining litigant would be required to discover the unknowable and to reconstruct what might have been and never was, a jury properly constituted after running the gauntlet of challenge performed in accordance with the prescribed rule of the game.

*Kentucky Farm Bur. Mut. Ins. Co. v. Cook, supra,* at 877 (citing Traynor, *The Riddle of Harmless Error* 66 (Ohio State Press 1970)). *See also Swain v. Alabama, supra,* 380 U.S. at 219, 85 S.Ct. at 835 (denial or impairment of the right to peremptory strikes is "reversible error without a showing of prejudice"); *Davenport v. Ephrain McDowell Mem. Hosp., supra,* at

---

**3.** As he did in *Stopher v. Commonwealth,* Ky., 57 S.W.3d 787, 813–17 (2001), Justice Keller recognizes here that his view is contrary to long-standing Kentucky precedent. Oddly, however, though he dissented in *Stopher* because he perceived that the majority had departed from long-standing precedent with which he disagreed but nevertheless felt compelled to follow until overruled, *id.* at 808, he concurs here with a majority opinion that he acknowledges departs from similar long-standing precedent with which he also disagrees but does not feel compelled to follow until overruled.

59 ("Granting the two non-antagonistic appellees six peremptory strikes was reversible error as a matter of law.").

The genesis of peremptory strikes is in the common law, not the Constitution. *Stilson v. United States,* 250 U.S. 583, 586, 40 S.Ct. 28, 29–30, 63 L.Ed. 1154 (1919). However, the grant, denial, and exercise of those challenges can have both Due Process and Equal Protection implications, *e.g., Batson v. Kentucky, supra,* 476 U.S. at 89, 106 S.Ct. at 1719, because, whereas an excusal for cause is exercised by an unbiased trial judge for the purpose of excluding a juror deemed legally unfit, a peremptory strike is exercised by a biased litigant for the purpose of honing the composition of the jury to a group deemed most favorable to that litigant's factual point of view.[4] Peremptory challenges are specifically limited and allocated by law, *i.e.,* by statute or rule, so that one side cannot unfairly "stack the deck" by removing all jurors suspected of favoring the other side. *Holland v. Illinois, supra,* 493 U.S. at 481, 110 S.Ct. at 808–09. "[I]f one party is allowed more peremptory challenges than the other, he is in effect, given an advantage in that he may select by indirection particular veniremen to try his cause." *Williams v. Pichard,* 150 Fla. 371, 7 So.2d 468 (1942), rejecting the theory that the right to a peremptory challenge is the right to reject, not the right to select. And in *Pendly v. Illinois Cent. R.R. Co.,* Ky., 92 S.W. 1 (1906), our predecessor Court held that a party was vested with a substantial right to have the other party's peremptory challenges limited to the number specified by law.

When the appellant accepted the full jury and tendered it to the defendants, they only had the right to peremptorily challenge three jurors, leaving nine jurors accepted by the appellant in the box. When they were permitted to remove six jurors, a substantial right of the appellant was taken from her. Three jurors that she had accepted, and was entitled to have try her case, were taken off the jury without authority of law.

*Id.* at 2.

There is no limitation on strikes for cause, and the granting of a motion to strike for cause is generally regarded as discretionary. But the number and allocation of peremptory strikes is established by law, and the trial judge has no discretion whether to apply that law. *State v. Bertrand,* 167 La. 373, 119 So. 261, 262 (1928). *See also Bowling Green Mun. Util. v. Atmos Energy Corp., supra,* at 579 ("the exceptions of CR 47.03 only permit additional strikes when the interests of the parties are antagonistic or when extra jurors are called.... No other exceptions are permitted."). The denial of the peremptory strikes to which a party is entitled denies that party the right afforded by law to excuse prospective jurors perceived to be biased either against that party or in favor of the opposing party. And to grant a party more peremptory strikes than those to which that party is entitled permits that party to excuse more prospective jurors than the law allows for the same reasons. Either way, the beneficiary of the error can "stack the deck" and thereby deny the aggrieved party both Due Process of law and Equal Protection under the law. U.S. Const., amend. XIV § 1; Ky. Const. § 3. For that reason, the misallocation of peremptory strikes is always prejudicial and is always treated as reversible error.

---

4. It is an old saw that a litigant does not want an unbiased jury but a jury that is biased in that litigant's favor.

To require a party to prove the unprovable in order to protect a right to which that party is entitled by law would also render the law, *i.e.*, CR 47.03(1) and RCr 9.40, directory rather than mandatory and enable every trial judge in the Commonwealth to decide for him/herself how many peremptories should be allotted on a case-by-case basis. That is precisely what happened in *Bowling Green Municipal Utilities v. Atmos Energy Corp.*, *supra*, and we summarily reversed that case for that reason. To permit peremptory strikes to be allocated arbitrarily and inconsistently on a case-by-case, court-by-court basis would be intolerable. It would be better to abolish peremptory strikes than to permit them to become, as here, the tool of judicial arbitrariness. Ky. Const. § 2.

### III. PUNITIVE DAMAGES INSTRUCTION.

The Court of Appeals also correctly held that the trial court erred by not instructing the jury on punitive damages in accordance with the requirements of *Pacific Mutual Life Insurance Co. v. Haslip*, 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991), and *Hanson v. American National Bank & Trust Co.*, Ky., 865 S.W.2d 302 (1993). In accordance with *Haslip*, *supra*, 499 U.S. at 19–20, 111 S.Ct. at 1044, we held in *Hanson* that, to satisfy the Due Process Clause of the United States Constitution, "instructions to the jury must define the purpose of punitive damages as punishment to the wrongdoer and as a deterrent to wrongdoers and others from such activities in the future." *Hanson*, *supra*, at 310. This is the same definition of punitive damages set forth in KRS 411.184(f).

Here, Ford tendered a punitive damages instruction that complied with the constitutional requirement: "[P]unitive damages are designed to punish Ford for allegedly malicious conduct and to deter Ford and others from engaging in such conduct in the future." Nevertheless, the trial judge gave the jury a punitive damages instruction that did not define the purpose of punitive damages in any respect but simply afforded the jury an unfettered avenue by which to award the Smith estate an unlimited amount of additional compensation. I conclude from the majority opinion's statement that "We discern no shortcoming in the instructions given that violates the standards set forth in *Hanson v. American Bank* (sic)," op., at 493, that the majority simply has not bothered to read the instructions that were, in fact, given. The instruction on punitive damages obviously did not comply with Due Process requirements, and "[i]n this jurisdiction it is a rule of longstanding and frequent repetition that erroneous instructions to the jury are presumed to be prejudicial." *McKinney v. Heisel*, Ky., 947 S.W.2d 32, 35 (1997).

### IV. EXCESSIVE PUNITIVE DAMAGES.

As stated in *Pacific Mutual Life Insurance Co. v. Haslip*, *supra*, "unlimited jury discretion ... in the fixing of punitive damages may invite extreme results that jar one's constitutional sensibilities." *Id.* at 18, 111 S.Ct. at 1043. Because juries sometimes "run wild" in awarding punitive damages, *id.*, it is necessary "to determine whether the Due Process Clause renders the punitive damages award in this case constitutionally unacceptable." *Id.*; see also *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 562, 116 S.Ct. 1589, 1592, 134 L.Ed.2d 809 (1996). Noting that "[e]lementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose," the

United States Supreme Court established in *Gore* a three-pronged test for determining whether a particular award of punitive damages passes constitutional muster: (1) the degree of reprehensibility of the defendant's conduct; (2) the disparity between the amount of the award and the harm or potential harm suffered by the plaintiff; and (3) the difference between this remedy and the civil penalties authorized or imposed in comparable cases. *Id.* at 574–75, 116 S.Ct. at 1598–99.

### 1. Degree of reprehensibility.

This issue is resolved by the fact that the NHTSA, the federal agency charged with investigating automobile safety complaints, concluded, after an extensive investigation conducted twelve years before this accident, that vehicles equipped with a transmission of the type installed in this Ford F–250 pickup truck were not sufficiently unsafe to warrant recall. Remember, federal law requires the NHTSA to issue a recall if its investigation reveals a safety-related defect. 49 U.S.C. §§ 30118, 30120.

### 2. Ratio.

The majority opinion concludes that the five-to-one ratio of punitive damages to compensatory damages approved in this case is an insufficient disparity to warrant a finding of excessiveness. Of course, the majority conveniently overlooks the fact that two-thirds of the compensatory damages awarded in this case were unsupported by any evidence and, thus, also excessive. The ratio should not be determined by measuring the punitive damages award against the unproved compensatory damages awarded by the same "runaway" jury that rendered the punitive damages verdict but against the *actual* damages prov-

en by the evidence. Here, the Smith estate proved $955,628.12 in damages for the destruction of Tommy Smith's power to labor and earn money and introduced no evidence warranting an award of damages for pain and suffering. Thus, the punitive damages verdict was twenty times greater than the actual damages proven, and the award of punitive damages deemed reasonable by a majority of this Court is fifteen times greater than the actual damages proven.

### 3. Sanctions for comparable misconduct.

This, of course, is the most significant factor proving that the punitive damages awarded in this case are "constitutionally unacceptable." *Haslip, supra,* 499 U.S. at 18, 111 S.Ct. at 1043. At the time of manufacture, at the time of the accident, and at the time of trial, the maximum permissible civil penalty for a motor vehicle design safety violation permitted by federal law was $800,000.00, even if there was proof of a series of similar violations. 49 U.S.C. § 30165(a).[5] More significantly, under Kentucky law, the maximum criminal penalty that could be imposed against Ford if it had *intentionally* killed Tommy Smith is $20,000.00. KRS 534.050(1)(a). And, of course, the amount of punitive damages approved here is almost three times greater than any previously reported award of punitive damages in Kentucky. The highest previous award was $5,775,000.00 awarded in *Hanson v. American National Bank & Trust Co., supra,* for *intentional* misconduct. The highest previous award of punitive damages in a wrongful death action was $15,000.00 in *Cooper v. Barth,* Ky., 464 S.W.2d 233 (1971), 1/100th of the

---

**5.** Congress increased the maximum to $15,000,000.00 by statutory amendment in 2000. Pub.L. 106–414 § 5(a) (2000). Presumably, that is how the majority opinion arrived at the $15,000,000.00 figure approved in this case. Of course an amendment adopted in 2000 could not provide notice with respect to acts that occurred in 1977 or 1993.

amount approved today. Clearly, Ford could not, either in 1977 or in 1993, have had "fair notice ... of the severity of the penalty," *i.e.,* $15,000,000.00, that might be imposed upon it for the negligent design of a transmission system manufactured for use in its motor vehicles. For that reason alone, the imposition of these punitive damages deprives Ford of its constitutional rights under the Due Process Clause.

It is now clear that the majority of this Court is incapable of enforcing the constitutional restraints against excessive punitive damages verdicts in this jurisdiction. In *Hanson v. American National Bank & Trust Co., supra,* this Court reversed an order of remittitur of a punitive damages verdict, declaring that there is no authority for court-ordered remittitur in this jurisdiction. *Id.,* 865 S.W.2d at 310. *See also Farmland Mut. Ins. Co. v. Johnson,* Ky., 36 S.W.3d 368, 383 (2000). In *Williams v. Wilson,* Ky., 972 S.W.2d 260 (1998), this Court applied its self-created "jural rights" doctrine to declare unconstitutional any legislative enactment that might so much as "impair" the unfettered discretion of juries to award punitive damages. And, today, while purporting to recognize the mandate for *de novo* review established in *Cooper Industries, Inc. v. Leatherman Tool Group, Inc., supra,* the majority does no more than grudgingly reduce an obviously excessive award to one that is also obviously excessive. *Compare BMW of North America, Inc. v. Gore, supra,* in which the Alabama Supreme Court reduced a $4,000,000.00 punitive damages verdict to $2,000,000.00, which the United States Supreme Court held was still excessive. In approving the slightly reduced, but still excessive, award in this case, the majority opinion repeatedly cites our unanimous opinion in another personal injury product liability case, *Owens–Corning Fiberglas Corp. v. Golightly, supra.* I wrote the opinion in *Golightly;* and suffice to say

that the compensatory damages verdict in that case was $290,000.00 and the punitive damages verdict was $435,000.00, a ratio of 1.5 to one, ten times less than the ratio approved here. To compare the damages awarded in *Golightly* with the damages awarded in the case *sub judice* borders on the absurd.

Perhaps, Justice Graves was right when he opined in *Farmland Mutual Insurance Co. v. Johnson, supra,* that "punitive damages have no place in modern tort law." *Id.* at 388 (Graves, J., dissenting). Certainly, punitive damages have no place in the tort law of a jurisdiction whose highest court has abdicated its responsibility to impose reasonable, much less constitutional, restraints against the excessive imposition of such damages. This case, and perhaps the entire concept of punitive damages, begs for further review by a Court that is more interested in Due Process of law than in the redistribution of wealth. Hopefully, this will not be the last Court to evaluate what has occurred in this case.

## V. REINSTATEMENT OF SAND HILL'S CLAIM.

The trial judge directed a verdict in favor of Ford with respect to Sand Hill's claim for damages. Indicative of the majority's mind-set with respect to this entire case is its decision to set aside that dismissal and reinstate Sand Hill's claim for damages. Remember, Sand Hill's claim against Ford was for recoupment of the $15,000.00 in fines imposed against it by MSHA and of the increased workers' compensation insurance premiums that it paid after September 1993.

My research fails to yield even a suggestion in American jurisprudence that the imposition of a fine by a government agency creates a cause of action for damages in

favor of the party against whom the fine was levied—no doubt because fines are penalties levied for the actor's own misconduct, not that of another. Presumably, the majority's research was equally fruitless since the majority opinion cites no authority for such a novel legal theory. Further, two of the citations issued by MSHA against Sand Hill pertained to the inoperable emergency brake. The third pertained partly to the fact that the gear shift mechanism on the truck was "worn out" and partly to the fact that the indicator was not properly synchronizing. Only that portion of the fine imposed for the improperly synchronizing indicator could possibly relate to a design defect. Richardson did not testify to that effect and neither he nor any other witness in this case suggested that the accident was caused by an improperly synchronizing indicator. Even if that were not so, Sand Hill offered no evidence to prove how much of the $15,000.00 fine was imposed because of the inoperable emergency brake and worn out gear shift and how much was imposed because of the improperly synchronizing indicator. Thus, the jury could only have speculated as to how much of the $15,000.00 fine, if any, was traceable to an alleged design defect.

Sand Hill's secretary/treasurer, Warren Freeman, testified that the company's workers' compensation insurance premium for "the year ending 1993" was $16,621.00, that the premium for the period September 1993 to September 1994 was $41,130.64, and that the premium for September 1994 to September 1995 was $40,032.64. However, he had no personal knowledge that the increase was caused by the September 2, 1993 accident as opposed to other factors, *e.g.*, that Sand Hill's new Mud Lick strip mine site did not begin operations until August 1993. KRE 602. Sand Hill had subpoenaed James Arnett of the Mt. Valley Insurance Agency as a witness, perhaps to prove the missing link of causation. When Arnett failed to appear for trial, the trial judge offered to issue a warrant to obtain his presence. After discussing the situation privately with Freeman and Wayne Napier, Sand Hill's attorney announced in open court that he was closing his case without Arnett's testimony and that the judge could "rule whatever you want to with regard to our case." The trial judge quite properly ruled that the case should be dismissed for failure to prove causation.

Accordingly, I dissent from the majority opinion in its entirety.

GRAVES and JOHNSTONE, JJ., join this dissenting opinion.

GRAVES, Justice, dissenting.

Respectfully, I must dissent.

Tommy Smith was an employee and agent of Sand Hill, the principal. Any negligent acts of the agent in the course of employment are imputed to the principal. Under the principles of agency law, Tommy Smith and Sand Hill have identical interests.

The Court of Appeals correctly ruled that because Sand Hill and the estate did not have antagonistic interests, the parties were not entitled to additional peremptory challenges. CR 47.03(1) has been consistently interpreted to deny additional peremptories to co-parties when the parties take the same position at trial. *Kentucky Farm Bureau Mut. Ins. Co v. Cook*, Ky., 590 S.W.2d 875, 876 (1979). The mere option for the plaintiff to place blame on Sand Hill does not give rise to the inference that the parties were antagonistic at trial. Rather, both parties sought to place the blame squarely on the shoulders of Ford Motor Co., leaving no room for doubt about the identical nature of their claims.

At the time of jury selection, CR 47.03(1) requires that there be actual antagonistic interests before additional peremptory challenges may be granted. Kentucky courts have held that interests of coparties are not antagonistic when the parties take "identical trial positions," *Kentucky Farm Bureau Mutual Ins. Co.*, *supra*, and when the parties "share the same theory of the case." *Davenport v. Ephraim McDowell Mem'l Hosp., Inc.*, Ky.App., 769 S.W.2d 56, 59 (1988). It is clear that in this instance, the estate and Sand Hill satisfy these descriptions perfectly and exclude any antagonistic interests.

Sand Hill was brought into the case only by Ford's third-party complaint, the estate having chosen not to sue it originally. Sand Hill then counterclaimed against Ford as the sole cause of the accident and for expenses incurred. After Ford dropped the complaint against Sand Hill in light of the Workers' Compensation Act, Sand Hill remained in the case only for apportionment purposes. Finally, the Court of Appeals recast Sand Hill as a third-party plaintiff and treated the counterclaim against Ford as a complaint. The estate claims that the label of "Plaintiff" did not change the fact that Sand Hill was really a defendant. Regardless of the label placed on Sand Hill, the lack of an adversarial relationship at any point in the proceedings shows that the parties' interests were not antagonistic.

Although Sand Hill was originally brought in as a defendant, which would tend to prove antagonistic interests between it and the estate, it is clear that during the trial both entities were only interested in proving that Ford was at fault. Neither party asserted a claim against the other, and counsel for the estate even assured the jury that Sand Hill was not at fault because they didn't make the truck. Instead, the estate wisely chose to place full blame on Ford, because under Kentucky's Workers' Compensation Act, KRS 342.690(1), Sand Hill could not be held financially liable. Thus, any fault which the jury attributed to Sand Hill would simply reduce the estate's recovery, and if Sand Hill was found to be 100% at fault, the estate would be denied recovery. Any potential for antagonism quickly vanished when the estate realized the ramifications of the Workers' Compensation Act, and it is inequitable to allow two parties with no intention of suing each other to gain double the usual peremptory strikes and, at least in theory, a more favorable jury. There can be no doubt, given these facts, that the parties shared the same theory of the case and took identical trial positions, making the grant of additional peremptories improper under CR 47.03(1).

The Court of Appeals decision should be affirmed on this issue.

COOPER, J, and JOHNSTONE, J., join in this dissent.